SECURITY INSURANCE COMPANY OF NEW
HAVEN—THE CONNECTICUT INDEMNITY
COMPANY *v*. MANGAN, ET AL.

[No. 241, September Term, 1967.]

242

*Decided May 31, 1968.*

*Motion for rehearing filed July 1, 1968; denied July 16, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, FINAN and SINGLEY, JJ.

*George Molnar,* with whom was *George H. Eggers* on the brief, for appellant.

No brief filed for appellees.

SINGLEY, J., delivered the opinion of the Court.

On 26 July 1965, Eldorado Dev., [sic] Inc. (Eldorado), borrowed $1,976.21 from The National Bank of Washington (the Bank) to finance the purchase of an automobile. The borrowing was evidenced by Eldorado's note, signed by John W. Mangan and his wife, Helen H. Mangan, in their respective capacities as president and secretary-treasurer of Eldorado. The note called for 17 monthly payments of $110.00 each and a final payment of $106.21.[1] The note was secured by a chattel mort-

---

1. The 18 monthly payments total $1,976.21. The note provided for interest at 6% and $61.57 of the amount of the loan, representing interest and finance charges, was retained by the Bank.

gage [2] on the 1963 Cadillac purchased by Eldorado. The chattel mortgage was signed "Eldorado Dev. Inc. by John W. Mangan Helen H. Mangan," without any indication of the capacity in which they signed, but the corporate seal was affixed. The acknowledgment identifies Mr. Mangan as the attorney in fact for Eldorado, and refers to an appended certification signed by Mr. Mangan as president and Mrs. Mangan as secretary, which designated Mr. Mangan the attorney in fact of Eldorado, for the purpose of acknowledging the chattel mortgage.

The Bank did not record its chattel mortgage,[3] and Eldorado, after making three monthly payments, defaulted. The Cadillac was executed upon and sold by another of Eldorado's creditors; the Bank stamped the note with a rubber stamp "Nat'l Bk. of Washington Jan. 13, 1966 P1-L Washington, D. C." and on 19 January 1966, returned the note to the Mangans, with a brief transmittal letter, signed by a vice president of the Bank which read: "Dear Mr. & Mrs. Mangan: Enclosed please find your cancelled note, since the Insurance Company honored our claim for the balance due on your note." At the trial below, the Bank's assistant cashier offered the following explanation:

"Q. Do you have any idea what happened to the orig-
    inal promissory note?
A. Yes, it was sent to the Mangans at the time the
    note was paid in full by the insurance company.
THE COURT: Was that done intentionally?
THE WITNESS: I think it was an error, sir."

On 5 May 1966, the appellant Security Insurance Company of New Haven—The Connecticut Indemnity Company (Security) describing itself as "Subrogee of The National Bank of

---

2. Which, by its terms, was to be regarded as a security agreement in jurisdictions where the Uniform Commercial Code (U C C) was in effect.

3. Nor was any filing made as provided in U C C § 9-401, Maryland Code (1957, 1964 Replacement Volume), Art. 95B, § 9-401. There was testimony that the decision to file or not to file a security agreement lay within the discretion of the Bank officer who made the loan.

Washington" (as required by Maryland Rule 243 a)[4] brought suit against Mr. and Mrs. Mangan in the Circuit Court for Montgomery County. Apparently under the misapprehension that the Bank had made the loan to the Mangans as individuals, the declaration alleged:

> "That the defendants did borrow from the National Bank of Washington a certain sum of money to finance the purchase of an automobile. That thereafter, the said automobile was seized by a creditor of the defendants and sold; that thereafter, the defendants did default in their payments to The National Bank of Washington.
>
> "Under a policy of insurance the plaintiff, Security Insurance Company of New Haven—The Connecticut Indemnity Company, a corporation, did pay to The National Bank of Washington the net sum due by defendants to the National Bank of Washington and is subrogated to this extent against the defendants.
>
> "Plaintiff claims the sum of $1,584.64 [5] of the defendants."

Filed as an exhibit was a copy of the "chattel mortgage non filing insurance proof of loss" which had been sent to Security by the Bank.

On 6 June 1966, the Mangans demurred, assigning among other grounds the failure of Security to allege the existence of an agreement of subrogation and the discharge of the obligation by the Bank. On 12 August 1966, the Mangans filed a general issue plea and a motion for summary judgment supported by an affidavit that they were not individually liable on the note.

Thereafter, on 6 March 1967, with leave of court, Security filed an amended declaration, joining Eldorado as a defendant. General issue pleas were filed by the Mangans and Eldorado.

---

4. *Cf.*, however, Code (1957) Art. 8, § 5, which permits a surety to whom a note has been assigned, to maintain an action in his own name.

5. The amount of the loan, $1,976.21, less payments, $330.00 and interest and finance charges, $61.57.

When the case came on for trial, one witness, the assistant cashier of the Bank, testified for Security. Security did not offer in evidence the insurance contract upon which its rights as a subrogee were apparently founded.[6] The lower court entered judgment for the Mangans and Eldorado; denied Security's motion for a new trial; and entered judgment in favor of the defendants for costs. This appeal followed.

Security contends that the lower court erred in holding (1) that the Mangans were not personally liable on the note and (2) that Security was required to prove its subrogation agreement in order to enforce its rights as a subrogee.

The first contention may readily be disposed of. Nowhere in the record is there evidence that the obligation was anyone's but Eldorado's. Eldorado was the obligor on the note and mortgagor on the chattel mortgage. The Mangans' signatures appear on the note only in their capacities as officers of Eldorado and the fact that they signed in their representative capacities is clearly set forth in the chattel mortgage. U C C § 3-403(3), Code (1957, 1964 Replacement Volume), Art. 95B, § 3-403(3). Admittedly, the loan was described as having been made to "John W. & Helen Mangan" in the proof of loss which the Bank filed with Security and as having been made to "John W. & Helen H. Mangan T/A Eldorado Dev., Inc." on the Bank's ledger card, but the fact that these characterizations were adopted by the Bank (in our view, erroneously) and without factual support, cannot be regarded as sufficient to charge the Mangans with individual liability.

With respect to its second contention, Security argues that it was not required to prove its subrogation agreement in order to enforce its rights as a subrogee, but need only have proved that it was not a volunteer and that it made payment under circumstances entitling it to reimbursement. This argument ignores the distinction between conventional subrogation on the one hand, and legal (or equitable) subrogation, on the other and overlooks the principle that an insurer is not necessarily entitled to subrogation as a matter of legal right but may, in

---

6. A copy of the contract was later filed with Security's motion for a new trial, but is not in evidence in the case before us.

fact, be denied subrogation under the terms of its contract or by a course of action or of inaction pursued by its insured.

> "There are known to the law two kinds of subro-gation, one of which is termed 'conventional,' and the other, in contradistinction, 'legal,' or, by reason of its origin and basis, 'equitable.' Some authorities have regarded assignments as a third type.[7] * * * Legal subrogation is a creature of equity not depending up-on contract, but upon the equities of the parties. In its most usual aspect, it arises by operation of law where one having a liability or a right or a fiduciary relation in the premises pays a debt owing by another under such circumstances that he is in equity entitled to the security or obligation held by the creditor whom he has paid. Conventional subrogation, as the term implies, is founded upon some understanding or agree-ment, express or implied, and without which there is no 'convention.' It occurs where one having no interest or any relation to the matter pays the debt of another, and by agreement is entitled to the rights and securities of the debtor so paid. The contract right of subroga-tion is somewhat broader than legal subrogation, for the right is granted irrespective of whether the pay-ment was necessary for the protection of the person seeking subrogation." (footnotes omitted). 50 Am. Jur. *Subrogation* § 3 at 679-80 (1944).

*See,* 83 C. J. S. *Subrogation* § 1 at 575-78 (1953); Sheldon, *Subrogation* § 248 at 285-86 (1st Ed. 1882).

The decisions of this Court have consistently recognized this distinction.

> "Legal subrogation (as distinguished from conven-tional and statutory subrogation) arises by operation of law when there is a debt or obligation owed by one

---

7. In our view, it would be preferable to regard subrogation by assignment as a form of conventional subrogation since recovery is based on the assignment. *Cf. Alexander v. Fidelity & Deposit Co.,* 108 Md. 541, 70 A. 209 (1908).

person which another person, who is neither a volunteer nor an intermeddler, pays or discharges under such circumstances as in equity entitled him to reimbursement to prevent unjust enrichment." [Citing cases and texts.] *Maryland Title v. Kosisky,* 245 Md. 13, 20, 225 A. 2d 47 (1966).

"Although it is difficult to lay down a general rule applicable to all cases in which subrogation is sought, the essential elements necessary for legal subrogation (as distinguished from conventional and statutory subrogation) are: (1) the existence of a debt or obligation for which a party, other than the subrogee, is primarily liable, which (2) the subrogee, who is neither a volunteer nor an intermeddler, pays or discharges in order to protect his own rights and interests. See 50 Am. Jur. [Subrogation] § 10; 83 C.J.S. [Subrogation] §§ 3, 5. If these requirements are met, legal subrogation exists by operation of law without the consent of the creditor. Mullen [The Equitable Doctrine of Subrogation, 3 Md. Law Rev. 201], at p. 203." *Schnader Inc. v. Cole Build. Co.,* 236 Md. 17, 23, 202 A. 2d 326 (1964).

There are important differences between conventional subrogation and legal subrogation. A conventional subrogee is ordinarily a complete stranger to the transaction. Since the conventional subrogee is bound by agreement, the volunteer or intermeddler never figures in conventional subrogation, so long as the conventional subrogee confines himself to his contractual obligation. A conventional subrogee may maintain an action for a *pro tanto* recovery, which a legal subrogee, who must pay in full in order to establish his rights, can never do. *Neptune Insurance Company v. Dorsey,* 3 Md. Ch. 334 (1850). The conventional subrogee is not necessarily entitled to subrogation as a matter of legal right if there are intervening equities, *Reconstruction Finance Corp. v. Maryland Casualty Co.,* 23 F. Supp. 1008 (D. Md. 1938), and his rights may be limited or denied him by the terms of his agreement, *Maryland Title v. Kosisky, supra,* 245 Md. at 21; 83 C. J. S. *op. cit.* § 3 b at

584-86, or extinguished by his creditor's course of conduct. *Packham v. German F. Ins. Co.,* 91 Md. 515, 46 A. 1066 (1900).

In any subrogation case, the burden of proving entitlement is on the subrogee. Security, misconceiving its role to be that of a legal subrogee, failed to meet this burden. As a conventional subrogee, for it merely to prove that it paid the Bank, on receipt of a proof of loss without proving that it was bound to do so, neither lays to rest the speculation that it may have been a volunteer nor negates the possibility that the right which it asserted may have been limited or denied by its agreement.

In support of its contention that it could recover on broad principles of legal subrogation without relying on the terms of its contract, Security places its principal reliance on three cases: *London Guaranty & Acc. Co. v. Enterprising Services,* 192 A. 2d 292 (D. C. App. 1963), where an insurance company sought to be subrogated to the rights of its insured in connection with a claim which it had paid under a burglary policy; *Washington Air Compressor Rental Co. v. National Union Ins. Co.,* 165 A. 2d 482 (D. C. Mun. App. 1960) (claim under property insurance policy for damages caused by blasting) ; and *Trinity Universal Ins. Co. v. Moore,* 134 A. 2d 333 (D. C. Mun. App. 1957) (claim under automobile collision policy). We do not regard these as controlling in the present case.

Admittedly, the manner in which courts have dealt with an insurer-subrogee has not been consistent. The broad generalization that legal subrogation is available to an insurer under a contract of indemnity, where the insurance was against loss, while only conventional subrogation is available to an insurer who insured against liability has become exception-ridden and distorted. Horn, *Subrogation in Insurance Theory and Practice* (Irwin, 1964) at 27-28, citing *Globe & Rutgers Fire Ins. Co. v. Foil,* 189 S. C. 91, 200 S. E. 97 (1938) ; *Gatzweiler v. Milwaukee Electric Co.,* 136 Wis. 34, 116 N. W. 633 (1908) ; *Aetna Life Ins. Co. v. J. B. Parker and Co.,* 96 Tex. 287, 72 S. W. 168 (1903) ; *Holland v. Morley Button Co.,* 83 N. H. 482, 145 A. 142 (1929). The problem is further clouded by the fact that the standard form of fire policy, which courts have

uniformly regarded as a contract of indemnity, according the right of legal subrogation to the insurer, by its terms permits the insurer to demand an assignment of the insured's right of recovery, thus giving rise to conventional subrogation. Mullen, *The Equitable Doctrine of Subrogation,* 3 Md. L. Rev. 201, 216 (1939). When we consider that modern insurance contracts may sound in both indemnity and liability, *e.g.,* an automobile policy combining collision, property damage and personal injury coverages, or a broad form of coverage provided by a homeowner's policy, where hazard and liability insurance may be combined in the same contract, the old rule that an indemnity contract gives rise to legal subrogation while a liability contract affords only conventional subrogation, can be sustained only with difficulty.

Horn, *op. cit.,* at 31-42, suggests an alternative: that legal subrogation, without requiring a formal assignment of the insured's right of recovery, should be permitted in all types of insurance relating to property, unless specifically barred by contract; [8] and that subrogation be denied in all other forms of insurance unless specifically permitted by contract. We do not regard this as a rule of law, but as a rationalization which not only has the charm of simplicity, but makes possible a convenient classification of the cases. Thus, an insurer who writes life, health and accident, or workmen's compensation coverage is denied subrogation unless specifically permitted by a policy provision or sanctioned by statute. *Baltimore Transit Co. v. Harroll,* 217 Md. 169, 175, 141 A. 2d 912 (1958); *Crab Orchard Improvement Co. v. Chesapeake & O. Ry. Co.,* 115 F. 2d 277, 281 (4th Cir. 1940); *Suttles v. Railway Mail Ass'n.,* 156 App. Div. 435, 141 N. Y. S. 1024, 1025 (1913); *Gatzweiler v. Milwaukee Electric Ry. & Light Co., supra; Newark Paving Co. v. Klotz,* 85 N. J. L. 432, 91 A. 91 (N. J. 1914);

---

8. It is quite usual for leases of commercial property to provide that the landlord will cause policies of fire and extended coverage insurance to be reframed so that the insurer is denied a right to be subrogated to a claim which the landlord might assert for damages to the leased premises caused by the negligence of the tenant.

*Conn. Mutual Life Ins. Co. v. N. Y. & N. H. R. R. Co.,* 25 Conn. 265 (1856).

Applying the rule of these authorities, Security's failure to prove its contract with the Bank amounted to a failure to prove its case, because recovery could not be based solely on the fact that it had paid the Bank, without proof that it was obligated to do so.

No point was made by Security, either in its brief or in argument before us, as to whether the case is controlled by the law of the District of Columbia (where the Bank is located and the loan was made) or of Maryland (where the action was brought). No District of Columbia case was cited, or found by us, which is at variance with the conclusion we reach. We assume, however, that the courts of the District of Columbia will follow Maryland cases in instances where the District of Columbia courts have not yet spoken. *Seidenberg v. Seidenberg,* 126 F. Supp. 19, 22 (D. D. C. 1954).

Nor do we reach the questions of whether Eldorado's obligation may have been discharged by the Bank's return of the cancelled note to the Marigans, *Packham v. German F. Ins. Co., supra,* or whether Security should have acted under Code (1957, 1968 Replacement Volume), Art. 8, § 3 and required an assignment of the note before bringing suit.

> *Judgment affirmed; costs to be paid by appellant.*