Michael G. RINN, Trustee, Appellant,

v.

**FIRST UNION NATIONAL BANK OF MARYLAND, Appellee.**

Civ. A. No. MJG–94–2030.

United States District Court,
D. Maryland.

Jan. 5, 1995.

Paul D. Trinkoff, Mary Fran Ebersole, Baltimore, MD, for appellant.

Lawrence J. Gebhardt, Gebhardt & Smith, Baltimore, MD, for appellee.

GARBIS, District Judge.

The Court has before it the Appeal of Michael G. Rinn, Trustee ("Trustee"), from a Memorandum Opinion issued by James Schneider, United States Bankruptcy Judge for the District of Maryland, on June 28, 1994, denying Trustee's motions to dismiss and for summary judgment, and dismissing Trustee's complaint to avoid the liens of First Union National Bank of Maryland ("First Union"). 176 B.R. 390. The Court has considered the materials submitted by the parties and finds a hearing unnecessary to resolve the matter.

## I. BACKGROUND

Ruppert Brothers of Maryland, Inc. ("Ruppert Brothers"), a Maryland corporation, served as a holding company for the assets of four subsidiaries. The subsidiaries, Baltimore Home Insulation, Inc. (a Maryland corporation), Advance Insulation & Supply, Inc. (a Virginia corporation), Colonial Insulation, Inc. (a Virginia corporation), and Wade Insulation, Inc. (a Delaware corporation) (collectively referred to as "the subsidiaries") were residential insulation contractors and installers of windows and doors.

On January 6, 1989, First American Bank of Maryland, now known as First Union National Bank of Maryland ("First Union"), extended credit facilities to Ruppert Brothers in the principal amount of $5.5 million. These facilities consisted of two lines of credit, a term loan, and vehicle financing. Ruppert Brothers used a substantial portion of the First Union loan and lines of credit to refinance an outstanding indebtedness of Ruppert Brothers to Maryland National Bank ("Maryland National"); in accordance with the parties' intent, First Union transferred a portion of the loan proceeds directly to Maryland National to satisfy the Ruppert Brothers' $4.05 million debt.[1] Prior to the refinancing, Maryland National had a perfected, first-priority security interest in the inventory and accounts receivable of Ruppert Brothers and the four subsidiaries.

On November 7, 1988, before the closing of the January, 1989, loans, First Union issued a commitment letter expressly providing that, as security for the loans, Ruppert Brothers would grant First Union a first-priority lien on all accounts receivable and inventory of Ruppert Brothers and the subsidiaries, as well as upon certain real property of Ruppert Brothers and certain affiliate entities. According to the commitment letter, Ruppert Brothers agreed to execute at closing all documents "as may be reasonably required by [First American] including Uniform Commercial Code Financing Statements." Due to an oversight however, the loan documents executed at the closing did not provide for the granting or perfection of a security interest by the Ruppert Brothers subsidiaries.[2] In short, upon the January 6, 1989, closing, the subsidiaries never executed any document granting to First Union a security interest in their assets. In addition, no financing statements were recorded in the appropriate registries indicating that First Union held a security interest in the subsidiaries' assets.

When this oversight was eventually discovered, the subsidiaries voluntarily granted a security interest to First Union in all of their assets. The grant occurred on or about February 7, 1992, and financing statements were filed to perfect the security interest on February 12, 1992. Importantly, the financing statements originally filed by Maryland National to perfect its earlier security interest in the subsidiaries' assets were never terminated or released and remained on record.

On March 25, 1992, within ninety days of the filing date of the First Union financial statements, the subsidiaries sold all of their tangible assets by bulk sales, with proceeds totalling $755,043.82. These proceeds are currently held by the Trustee. On May 5, 1992, also within ninety days of the filing date, involuntary Chapter 7 bankruptcy petitions were filed in Bankruptcy Court against the four subsidiaries (hereinafter "the debt-

---

1. Ruppert Brothers' indebtedness to Maryland National consisted of a $750,000 balance on a term loan and a $3.3 million balance on a Maryland National line of credit.

2. First Union has attributed this failure to execute the proper documents to the negligence of its then counsel.

ors"). On September 15, 1992, Michael G. Rinn, the Plaintiff in this case, was appointed Charter 7 trustee ("Trustee") for the debtors' jointly-administered estates.

On January 26, 1993, First Union filed a complaint seeking a declaratory judgment that (1) it was entitled to assert, through the doctrine of equitable subrogation, Maryland National's perfected security interest in the accounts receivable and inventory of the Ruppert Brothers subsidiaries, and (2) that its right to these assets was superior to that of the Trustee. In essence, First Union asserted that its security interest was perfected not on February 12, 1992, when its own financing statements were eventually filed, but years earlier when Maryland National had perfected its first-priority lien in the assets. According to First Union, it therefore possessed a first priority security interest in funds held by Trustee as proceeds from the sale of the debtors' collateral. The Trustee moved to dismiss the complaint for failure to state a claim, and argued that even if First Union had an equitably subrogated lien, the "strong arm" clause of section 544 of the Bankruptcy Code gave priority to the Trustee's hypothetical judgment lien.

On March 1, 1993, the Trustee filed a complaint seeking to avoid the security interest in the assets of the subsidiaries granted to First Union in the February 7, 1992, security agreement. According to the Trustee, this transfer was a preference granted within ninety days of the filing of bankruptcy petitions and therefore voidable under sections 544, 547 and 550 of the Bankruptcy Code. First Union answered and filed a counterclaim in which it again sought a declaratory judgment that it had a perfected, non-voidable first-priority security interest because of its equitable subrogation to the position of Maryland National.

On June 29, 1994, the Bankruptcy Court ruled that First Union was equitably subrogated to Maryland National's security interest and that those liens were invulnerable to attack by the Trustee because they were perfected outside the preference period. According to the Bankruptcy Court, when First Union refinanced Maryland National's priority security interest in the subsidiaries' as-

sets, the principles of equitable subrogation effected an assignment of the interests held by Maryland National in the collateral to First Union. Thus, because in the case of assignments no supplemental filing is required to continue the perfected status of a security interest against creditors of and transferees from the original debtor, no formal filing was required for First Union to "continue" Maryland National's earlier perfection. Finding no "intervening equities" in favor of the Trustee, the Bankruptcy Court held that the negligence of First Union's counsel to draw up the necessary documentation did not act as a bar to the application of equitable subrogation. The Bankruptcy Court further relied on Maryland National's unreleased financial statements to satisfy the Uniform Commercial Code requirement of notice to potential creditors of an outstanding perfected priority interest in the debtor's collateral.

In sum, the Bankruptcy Court held that a first-priority security interest in the debtors' assets was perfected by the filing of properly-recorded financing statements by Maryland National. Because First Union agreed to refinance the subsidiaries' debt to Maryland National in 1989 on the express condition that First Union assume that same first-priority secured creditor status, the doctrine of equitable subrogation operated to overcome the parties' negligence in not filing new security agreements or financial statements and to place First Union in the perfected shoes of Maryland National. Consequently, because First Union was entitled to rely upon the perfection obtained by Maryland National years before the ninety day preference period preceding the May 5, 1993 filing of Chapter 7 petitions, the perfected security interest held by First Union was not an avoidable transfer under the "strong-arm" clause of the Bankruptcy Code.

The Trustee brings this appeal pursuant to 28 U.S.C. §§ 158(a) and 1292(b). The Court has before it the following two issues:

1. Whether the doctrine of equitable subrogation permits First Union to assert the perfected security interest of Maryland National, a lender whose debt was refinanced with the proceeds of First Union's

loan, after First Union failed to obtain its own perfected security interest; and

2. Whether First Union's right to assert a prior lender's perfected security interest through equitable subrogation defeats the Trustee's rights as a judgment lien creditor under § 544(a)(1) of the Bankruptcy Code.

## II. *LEGAL STANDARD*

 When a district court reviews a bankruptcy court's judgment, it acts as an appellate court. Accordingly, legal conclusions are to be reviewed *de novo*, whereas factual findings are set aside only if clearly erroneous. *Matter of CHG Intern., Inc.* 897 F.2d 1479, 1482 (9th Cir.1990); *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 84 (3rd Cir.1988); *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir. 1987); *In re Columbia Data Products, Inc.*, 99 B.R. 682, 683 (D.Md.1989), *aff'd*, 892 F.2d 26 (4th Cir.1989). Mixed questions of fact and law which contain "primarily a consideration of legal principles" are considered *de novo*. *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263, 1266 (10th Cir.1988). In this case, the two issues on appeal—the applicability of equitable subrogation and its interrelationship with the "strong-arm" clause of the Bankruptcy Code—are legal issues which this Court will review *de novo*.

## III. *DISCUSSION*

### A. Subrogation

 Broadly defined, subrogation is the substitution of one person in the place of another with reference to a lawful claim or right. 73 Am.Jur.2d *Subrogation* § 1 at 598 (1974); Sheldon, The Law of Subrogation, § 1 (1st ed. 1882). Originating in equity, the doctrine's operation at law is governed by equitable principles. *Compania Anonima Venezolana de Navegacion v. A.J. Perez Export Co.*, 303 F.2d 692, 697 (5th Cir.1962), *cert. denied*, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962). Subrogation is intended to provide relief against loss to a meritorious creditor who has paid the debt of another, *Bachmann v. Glazer*, 316 Md. 405, 559 A.2d 365, 368 (1989), and to obtain an equitable adjustment between parties "by securing the ultimate discharge of a debt by the person who in equity ought to pay it." *Collins v. Blue Cross of Virginia*, 213 Va. 540, 193 S.E.2d 782, 784 (1973).

 There are two kinds of subrogation: legal and conventional.[3] *Security Ins. Co. v. Mangan*, 250 Md. 241, 242 A.2d 482, 485 (Md.1968). Legal subrogation is a construct of equity and does not depend upon a contract. Conventional subrogation, by contrast, is founded upon some understanding or agreement, express or implied, and is often treated as synonymous with assignment.[4] *Id.* In essence, conventional subrogation is the result of an agreement that the liens existing as security for the debt shall be kept alive for the lender's benefit. *Bachmann v. Glazer*, 316 Md. 405, 559 A.2d 365, 368 (1989) ("The doctrine is a legal fiction whereby an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of this third person."); *Levenson v. Capital Mortgage*, 101 Md.App. 122, 643 A.2d 505, 509 (1994) (same).[5] It may be

---

**3.** Some courts have recognized "statutory subrogation," or subrogation arising from a legislative act, as a third subtype. *See, e.g., Bachmann*, 559 A.2d at 368; *Finance Co. of America v. U.S.F. & G. Co.*, 277 Md. 177, 353 A.2d 249, 249 (1976). In addition, some authorities regard assignments as a subtype of subrogation, while others merely regard them as a form of conventional subrogation. *Mangan*, 242 A.2d at 485 n. 7.

**4.** The word "conventional" is defined as "growing out of or established by convention; that is, an agreement or mutual engagement between persons." *George A. Hoagland & Co. v. Decker*, 118 Neb. 194, 224 N.W. 14 (1929). Indeed, some courts have held that an express agreement that a lien be kept alive for the benefit of one

advancing money to pay a debt, or that the lien be assigned, is not required if from all facts and circumstances surrounding the transaction it is clearly implied that it was the *intention of the parties that the person making the advance was to have security of equal dignity and position with that discharged. See, e.g., Martin v. Hickenlooper, 90 Utah 150, 59 P.2d 1139, 1151 (1936), citing Jackson Trust Co. v. Gilkinson, 147 A. 113, 114* (N.J.Eq.1929) (emphasis added).

**5.** It has been suggested that subrogation will be applied in these cases "as a matter of doing justice rather than as a manner of exacting performance of the contract, the so-called agreement being of value only as showing a situation

invoked "where one having no interest or any relation to the matter pays the debt of another, and by agreement is entitled to the rights and securities of the debtor so paid." [6] *Mangan,* 242 A.2d at 485.

■■■■ Founded on principles of natural reason and justice, subrogation is a highly favored doctrine and expansively applied. *D'Angelo v. Cornell Paperboard Products Co.,* 19 Wis.2d 390, 120 N.W.2d 70, 76–77 (1963); *3105 Grand Corp. v. New York,* 288 N.Y. 178, 42 N.E.2d 475, 477 (1942); *see also Compania Anonima Venezolana de Navegacion v. A.J. Perez Export Co.,* 303 F.2d 692, 697 (5th Cir.1962), *cert. denied,* 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962) ("These principles [of subrogation are] so well established that to cite cases would be an affectation"). Indeed, subrogation has been consistently upheld by courts in each of the states in which the subsidiaries' assets are located—Maryland, Delaware, and Virginia—and thus whose laws control this proceeding.[7] *See e.g., Collins v. Blue Cross of Virginia,* 213 Va. 540, 193 S.E.2d 782, 785 (1973) ("The general right of subrogation has long been recognized and favored in Virginia"); *Bachmann v. Glazer,* 316 Md. 405, 559 A.2d 365 (1985); *Willis v. Continental Cas. Co.,* 649 F.Supp. 707, 709 (D.Del.1986) ("Delaware courts have long recognized that '[s]ubrogation is a creature of equity, historically cognizable in our [courts]' ").

■■■■ Once applied, subrogation places the party subrogated in the shoes of the creditor. *Levenson v. Capital Mortgage,* 101 Md.App. 122, 643 A.2d 505, 510 (1994). The party subrogated acquires all rights, securities, and remedies the creditor has against the debtor

and is "[regarded] as constituting one and the same person with the creditor whom he succeeds." *Peek v. Wachovia Bank & Trust Co.,* 242 N.C. 1, 86 S.E.2d 745, 755 (1955). As the Supreme Court summarized: "One who rests on subrogation stands in the place of one whose claim he has paid, as if the payment giving rise to the subrogation had not been made." *United States v. Munsey Trust Co.,* 332 U.S. 234, 242, 67 S.Ct. 1599, 1603, 91 L.Ed. 2022 (1947).

## B. Subrogation of First Union

First Union claims it is entitled to conventional subrogation based on the express or implied agreement that First Union would assume a first priority security interest of equal dignity as that possessed by the previous creditor, Maryland National, in exchange for its refinancing of the Maryland National debt. It is undisputed that First Union extended its January, 1989, loan to the Ruppert Brothers subsidiaries on the express condition that it receive the identical security interest in the subsidiaries' inventory and accounts receivables that Maryland National possessed at that time. The November, 1988, commitment letter set forth this condition, and the Trustee does not deny that the debtors readily agreed to the condition. It was pursuant to this mutual agreement that First Union directly paid Maryland National funds necessary to refinance the subsidiaries' debt.

■■■■ Courts have traditionally applied the doctrine of subrogation in the context of one who pays off a mortgage or encumbrance which the principal debtor has failed to discharge.[8] As the court stated in *Levenson v.*

---

where the doctrine of subrogation should be applied in order to do justice and as evidence that the lender was not a volunteer." *Martin v. Hickenlooper,* 90 Utah 150, 59 P.2d 1139, 1152 (1936).

6. In this respect, a party's right under conventional subrogation is somewhat broader than legal subrogation, for the right is granted irrespective of whether the payment was necessary for the protection of the person seeking subrogation. *Id.*

7. The extent of a bankruptcy trustee's strong-arm powers is defined by the law of the situs where

the subject property is located. *In re Bridge,* 18 F.3d 195, 200 (3rd Cir.1994), *citing* 4 Lawrence P. King, *Collier on Bankruptcy* ¶ 544.02, at 544–5, 544–14 (15th ed. 1993).

8. A third person paying off or furnishing funds to pay off an encumbrance may acquire the right of subrogation:

> by virtue of an agreement to that effect, as where there is an agreement that the security shall be kept alive for the benefit of the person making the payment or advancement, or that he will have the same priority as the holder of the security, or that he shall have a first lien on the property for the repayment of the sum

*Capital Mortgage,* 101 Md.App. 122, 643 A.2d 505, 510 (1994):

> [T]he weight of authority extends the application of the doctrine of equitable subrogation to situations in which the initial and refinancing lenders are not the same, *provided the refinancing lender's money is intended to be used, and is used, to eliminate a specific encumbrance, and the refinancing lender intended "to get as security for his loan* either the land free and clear of the encumbrance or else *the benefit of the encumbrance itself" rather than rely upon the general credit of the mortgagor.*

*Id.* 643 A.2d at 510 (emphasis added), *quoting* 4 American Law of Property § 16.149 at 349 (1952). *See also, Kaplan v. Walker,* 164 N.J.Super. 130, 395 A.2d 897, 900 (1978) ("As to the ... rule of subrogation of a refinancing lender to the position of the lender whose lien is discharged by the proceeds of the later loan, there being no prejudice to or justified reliance by a party in adverse interest, there can be no doubt"); *French Lumber Co. v. Commercial Realty & Finance Co.,* 346 Mass. 716, 195 N.E.2d 507 (1964). In these cases, "equity, speaking from the standpoint of good conscience, substitutes the person so paying the debt to the place of the original creditor, so far as to enable him to enforce the security for the purpose of reimbursement." *Martin v. Hickenlooper,* 90 Utah 150, 59 P.2d 1139, 1152 (1936), *quoting Jackson Trust Co. v. Gilkinson,* 147 A. 113, 114 (N.J.Eq.1929). Likewise, the equities in the case at bar dictate that conventional subrogation be applied to keep the Maryland National first-priority perfected lien alive in favor of First Union, which loaned the subsidiaries funds to pay off the Maryland National debt on the express condition that it assume this lien.

▇▇▇▇ It is not necessary that the one to whose rights another is subrogated make

a formal assignment of the securities or other rights to the subrogee. *French Lumber Co. v. Commercial Realty & Finance Co.,* 346 Mass. 716, 195 N.E.2d 507, 509 (1964); *Federal Land Bank of Baltimore v. Joynes,* 179 Va. 394, 18 S.E.2d 917, 921 (1942). As the court stated in *Martin v. Hickenlooper,* 90 Utah 150, 59 P.2d 1139 (1936):

> [W]here there is a promise on the part of the [debtor] or his transferee, given to one who pays money to pay off a lien, ... such lender will be in equally as good position as regards security as the lienholder whose lien his money was intended to discharge and did discharge. He will be considered in equity as an assignee of the lien and especially where assurances are given him that his lien will be or is a first lien.

*Id.* 59 P.2d at 1152. Similarly, the Third Circuit has held:

> The form which an agreement shall take in order to create an equitable lien or mortgage is quite immaterial, for equity looks at the final intent and purpose rather than at the form. *If an intent to give, charge or pledge property, real or personal, as security for an obligation appears, and the property or thing intended to be given, charged or pledged is sufficiently described or identified, then the equitable lien or mortgage will follow as of course.*

*In re Bridge* 18 F.3d 195, 200 (3rd Cir.1994), *quoting Rutherford Nat'l Bank v. H.R. Bogle & Co.,* 169 A. 180, 182 (N.J.Ch.1933) (internal citations omitted) (emphasis added). Therefore, it was not necessary for Maryland National to formally assign its perfected security interest to First Union; as long as First Union and the debtors intended to pledge personal property as security for their obligation to First Union, and this property—the subsidiaries inventory and receivables—was sufficiently described or identified, the equitable lien followed as of course. Moreover, equity, regarding that as done which ought

loaned, or an agreement that a new mortgage is to be executed to the lender. A first lien thus acquired by subrogation is good not only as against the borrower, but as against anyone else who subsequently acquires an interest in the property with knowledge of the circumstances under which the money was advanced.... This principle will be applied

even where the record shows a release of the satisfied encumbrance, since the lien so satisfied will be renewed for the benefit of the party satisfying the same, where there has been no gross negligence and where justice requires that it be done.
73 Am.Jur.2d *Subrogation* § 92 at 655 (1974) (footnotes omitted).

to have been done, treats the assignment as being made as soon as the right to subrogation arises, which is ordinarily the time at which the subrogee pays the debt. 73 Am. Jur.2d *Subrogation* § 111 at 669–70 (1974). Accordingly, the equitable assignment of Maryland National's perfected security interest was made in January, 1989, the time at which First Union paid the Maryland National debt.

### 1. Failure to Perfect Security Interest Under U.C.C. Title 9

Trustee argues that because First Union failed to follow the proper procedures to obtain and perfect its security interests, equitable subrogation should be denied. To perfect a security interest in property, Title 9 of the Uniform Commercial Code ("U.C.C."), which has been adopted by each of the states involved in this case, requires the filing of a financial statement in the appropriate registries. U.C.C. § 9–403. First Union did not

file financial statements regarding its security interest in the debtors' inventory and accounts receivables until February 12, 1992.

 Section 1–103 of the U.C.C. provides, however, that "[u]nless displaced by the particular provisions of [the U.C.C.] … the principles of law and equity … shall supplement its provisions." Courts have consistently held that "[n]othing in the provisions of Title 9 regarding secured transactions expressly or implicitly refutes the application of subrogation." *See, e.g., In re Bridge,* 18 F.3d 195, 202 (3rd Cir.1994); *Finance Co. of America v. U.S. Fid. & Guar. Co.,* 277 Md. 177, 353 A.2d 249, 253 (1976); *French Lumber C. v. Commercial Realty & Finance Co.,* 346 Mass. 716, 195 N.E.2d 507, 510 (1964). *See also* 1 *Gilmore, Security Interests in Personal Property* § 15.3 at 476 n. 7 (1965). Therefore, the formal procedures mandated by the U.C.C. may be supplemented by the principles of equitable subrogation.[9] In other words, First Union fail-

---

9. The Trustee cites a number of cases in which courts refused to recognize an equitable lien or to allow an equitable lien to defeat a bankruptcy trustee's strong-arm power under the Bankruptcy Code. These cases can be distinguished from the case at bar.

For instance, in a number of cases denying relief to the unperfected lienholder, the equitable issue involved was not subrogation, but *notice.* In short, the lienholder argued that because the debtor, or bankruptcy trustee, was aware of the intended security interest, equitable principles should preclude the trustee from avoiding the liens, despite their statutory inadequacies. The courts held that since a bankruptcy trustee assumes the position of an ideal, hypothetical lien holder who holds the power to avoid any transfer of property or obligation incurred by the debtor, *"without regard to any knowledge of the trustee or any creditor,"* the unperfected security interests were voidable despite any alleged knowledge or notice. *See In re Greenbelt Co-op., Inc.,* 124 B.R. 465, 471–72 (Bankr.D.Md.1991); *In re Pirsig Farms, Inc.,* 46 B.R. 237, 242 (Bankr.D.C.1985).

In the case at bar, First Union does not argue that the Trustee should be precluded from asserting his strong-arm power merely because the subsidiaries had notice or knowledge of First Union's intended security interest. Instead First Union argues that it is entitled, by reason of the parties' express and admitted agreement, to be *equitably subrogated* to the *perfected* security holder position of Maryland National. Because a bankruptcy trustee may not avoid security interests perfected *before the preference period* even

under the strong-arm clause, First Union contends it holds an unavoidable lien.

Similarly, the court in *In re Hendleman,* 91 B.R. 475 (Bankr.N.D.Ill.1988) was not faced with a claim for equitable subrogation. In *Hendleman,* the court spoke merely to the creation of an equitable lien and whether that lien could effectively defeat a bankruptcy trustee's power of avoidance. While the court acknowledged that an equitable lien may be created by an express or implied contract, it held that this unperfected security interest was avoidable by the bankruptcy trustee. *Id.* at 476.

The factual situation in *Hendleman,* however, is likewise distinguishable from this case. In *Hendleman,* if the court was to grant the lien the parties agreed upon, that lien would take the form of an unperfected security interest. Under the strong-arm clause of the Bankruptcy Code, a trustee may avoid all unperfected security interests. The court did not address a situation where the creditor and debtor entered an express or implied agreement that the creditor would be extended the same first-priority *perfected* security interest as the prior creditor in exchange for its refinancing of the prior debt. Thus, the court was not confronted with an equitable lien which would be unavoidable by a bankruptcy trustee under § 544(a). In short, the court was not confronted with a claim of equitable subrogation. *See also In re T. Brady Mechanical Services, Inc.,* 133 B.R. 441 (Bankr.N.D.Ill.1991) (addressing issue of creating equitable lien but not of subrogation to prior perfected lienholder status); *In re O.P.M. Leasing Services, Inc.,* 23 B.R. 104 (Bankr.S.D.N.Y.1982) (same).

ure to satisfy the statutory filing requirements becomes immaterial once it is equitably subrogated to the position of Maryland National, which had properly obtained and recorded financial statements for a security interest in the debtors' inventory and accounts receivable.[10]

## 2. First Union's Negligence

 Trustee argues that First Union cannot be equitably subrogated to a position it negligently failed to procure under the proper statutory procedures. Whereas inexcusable neglect of the party seeking subrogation may preclude relief, the mere fact that the party has in some respects been negligent, or been guilty of acts of omission, does not necessarily and in the absence of intervening equities defeat his right to subrogation. *Federal Land Bank of Baltimore v. Joynes,* 179 Va. 394, 18 S.E.2d 917, 921 (1942); *Levenson v. Capital Mortgage,* 101 Md.App. 122, 643 A.2d 505, 510 (1994) ("negligence *vel non* of the lienholder requesting equitable subrogation ... is not relevant, unless the intervening lienholder can show detrimental reliance on that negligence"). Especially where such ordinary negligence is as to the lender's own interest and does not affect prejudicially the interest of the person to whose rights he seeks to be subrogated, or where the negligence does not increase the burdens of any lienholder, relief will not be barred. *Kaplan v. Walker,* 164 N.J.Super. 130, 395 A.2d 897, 901 (1978); *Milholland v. Tiffany,* 64 Md. 455, 2 A. 831, 835 (1886).

10. Under the U.C.C., "If a secured party assigns a perfected security interest, no filing [under Title 9] is required in order to continue the perfected status of the security interest against creditors of and transferees from the original debtor." U.C.C. § 9–302(2) (1994).

11. The purpose of the U.C.C. filing system is to give notice to interested parties that a security interest exists in the property of the debtor. A financing statement is effective as long as it puts any searcher on inquiry. *In re Nowling,* 124 B.R. 858, 860 (Bankr.N.D.Fla.1991). Maryland National's unreleased financing statement would have been effective to give notice or to put any searcher on notice that a security interest existed in the inventory and accounts receivable of the debtors.

 First Union's alleged negligence in failing to meet the statutory recording requirements does not rise to the gross or "inexcusable neglect" necessary to preclude relief. As soon as First Union discovered the oversight of its previous counsel, it had the proper forms executed and filed. Moreover, the Trustee · has not established that any intervening lienholder detrimentally relied upon First Union's failure to file. Indeed, because the statutory filings of Maryland National for the same property remained on record, any potential lender would be put on notice of the outstanding security interest in the subsidiaries' collateral.[11]

## 3. The "Strong–Arm" Clause

 The Trustee asserts that even if an equitable lien was created by the parties' express or implied agreement, section 544(a) of the Bankruptcy Code, the "strong-arm" clause, enables a bankruptcy trustee to avoid such liens. In effect, section 544(a)(1) of the Bankruptcy Code provides that, as of the date of bankruptcy petition filing, the bankruptcy trustee obtains the rights of a hypothetical judgment lien creditor.[12] Section 544(a) has been described as the "so-called· 'strong-arm clause' of the statute by which the trustee becomes the 'ideal creditor, irreproachable and without notice, armed *cap-a-pie* with every right and power which is conferred by the law of the state upon its most favored creditor who has acquired a lien by legal or equitable proceedings.'" *Havee v. Belk,* 775 F.2d 1209, 1218 n. 15 (4th Cir.1985), *quoting In re Kravitz,* 278 F.2d 820, 822 (3rd Cir.1960).

12. Title 11, section § 544(a) of the Bankruptcy Code provides in relevant part:

 (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
 (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such a creditor exists.

 11 U.S.C. § 544(a)(1) (1988).

Trustee contends that the February 7, 1992, grant of a security interest in the subsidiaries' inventory and accounts receivables, and the subsequent filing of financial statements perfecting that interest on February 12, 1989, constitute an avoidable transfer of interest within the preference period (i.e., within 90 days of the filing of the bankruptcy petition) under the strong-arm clause.[13] The Trustee further contends that even if an equitable lien was created by the parties' agreement, a fundamental tenet of bankruptcy law underlying the "strong-arm" is that a trustee has the absolute power to avoid such equitable liens. Trustee supports this position with a string of cases suggesting that the strong-arm powers conferred upon the trustee under § 544(a) impliedly include the power to defeat all unperfected liens. *See e.g., In re T. Brady Mechanical Services, Inc.,* 133 B.R. 441, 446 (Bankr.N.D.Ill.1991); *In re IDK Logging, Inc.,* 116 B.R. 788, 792 (Bankr.E.D.Wash.1990); *Matter of Einoder,* 55 B.R. 319 (Bankr.N.D.Ill.1985).

The Third Circuit recently discussed this issue in *In re Bridge,* 18 F.3d 195 (3rd Cir. 1994). In *Bridge,* the court began by rejecting the trustee's contention that federal Bankruptcy Code provisions alone control the validity of unperfected equitable liens:

> Although we recognize that historically the bankruptcy laws have been hostile to secret liens and that the case law has recog-

nized the power of the trustee to defeat unprotected liens, we disagree that this means that federal law determines the scope of a trustee's avoidance powers.

*Id.* at 199. The court went on to note:

> The case law has uniformly recognized that [the] legislative history indicates Congress in enacting § 544(a)(3) "did not intend to transform the trustee into a 'super-priority' creditor" ... or to grant the trustee "a substantial additional mantle of power not available to any actual [creditor or] subsequent purchaser [under state law]." ... [A]lthough the trustee's strong arm powers arise under federal law, the scope of these avoidance powers vis-a-vis third parties is governed entirely by the substantive law of the state in which the property in question is located as of the bankruptcy petition's filing.

*Id.* at 200.[14]

After reaffirming the supremacy of state substantive law in the "strong-arm" context, the court distilled its inquiry to two questions: (1) whether the creditor possessed an equitable lien; and (2) if so, whether the doctrine of equitable subrogation operated to place the creditor in the priority position of the creditor of the first recorded debt (now extinguished), and thus defeated the trustee's strong arm powers. *Id.*

---

**13.** Pursuant to 11 U.S.C. § 547(b): "[T]he trustee may avoid any transfer of any interest of the debtor in property—

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) *made*—
 *(A) on or within 90 days before the date of the filing of the petition;* ...
(5) that enables such creditor to receive more than such creditor would receive if—
 (A) the case were a case under chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title."

**14.** Similarly, the Fourth Circuit has held that:

[W]hile it is the federal law which provides the trustee with his "strong-arm" power, his exer-

cise of such power and its extent are governed entirely by the applicable state law.... *[the strong-arm section] confers on the trustee no "greater rights than those accorded by the applicable [state] law to a creditor holding a lien by legal or equitable proceedings."*
*Havee v. Belk,* 775 F.2d 1209, 1218–19 (4th Cir. 1985), *quoting* 4A *Collier on Bankruptcy,* 604 (14th ed. 1976) (emphasis added); *accord Angeles Real Estate Co. v. Kerxton,* 737 F.2d 416, 418 (4th Cir.1984) ("A trustee in bankruptcy stands in the shoes of the bankrupt and succeeds only to the bankrupt's interest in property [as a judgment lien creditor].... Thus, if under applicable state law a judgment lien creditor would prevail over an adverse claimant, the trustee in bankruptcy will prevail; if not, he will not."); *Eastern Shore Bldg. v. Bank of Somerset,* 253 Md. 525, 253 A.2d 367, 370 (1969) ("A judgment creditor 'stands in the place of his debtor, and he can only take the property of his debtor, subject to the equitable charges to which it was liable in the hands of the debtor, at the time of the rendition of the judgment.")

Significantly, the Third Circuit declined to follow a case cited by the creditor, *Kaplan v. Walker*, 164 N.J.Super. 130, 395 A.2d 897 (1978), in which the court had applied the doctrine of equitable subrogation to defeat a trustee's strong arm power. In doing so, the Third Circuit pointed to two critical ways in which *Bridge* differed from *Kaplan*. First, the case in *Kaplan* involved personal property; thus the court had examined the applicability of equitable subrogation within the framework of the Uniform Commercial Code, "which specifically mandates the incorporation of equitable principles." *Id.* at 204. The case in *Bridge* involved realty, which was governed not by the U.C.C. but by controlling common law precedent.

Second, the bankruptcy trustee in *Kaplan* occupied the position of a hypothetical *lien creditor.* Although the trustee was considered not to have any actual or constructive notice of the second unrecorded lien, "the competing interests of the two lien creditors were in equipoise, i.e., lien creditor versus lien creditor." *Id.* In *Bridge,* the mortgagee was defending his equitable lien against the trustee as a hypothetical *bona fide purchaser.* As legal title holder of the real property, a bona fide purchaser holds a supervening interest. Given these distinctions, the court held that "since a bona fide purchaser acquiring title under such circumstances would have taken clear of the mortgages, the trustee must also take clear of the mortgages." *Id.*

 The case at bar, by contrast, fits squarely within the *Kaplan* fact pattern. The property in which First Union alleges an interest is personal property: debtors' inventory and accounts receivable. Applicability of equitable subrogation in this case, then, is determined within the framework of the U.C.C., which expressly provides for the incorporation of equitable principles. Moreover, the Trustee in this case occupies the position of a hypothetical lien creditor of personal property under 544(a)(1) rather than that of a hypothetical bona fide purchaser of real property under § 544(a)(3). Therefore, the Trustee does not possess a supervening interest. In fact, as a hypothetical judgment creditor, the Trustee stands in a subordinate position to a perfected security interest. *See* U.C.C. §§ 9–201 and 9–301 [15]; Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* (Rev. Ed.) § 3.03. Given these considerations, application of equitable subrogation to protect the superior interest of First Union is appropriate.

 Thus, although a bankruptcy trustee, "endowed by the [Bankruptcy] Code with the strong arm powers of § 544, is the perfect litigant without flaw," *In re Barnett,* 62 B.R. 638, 640 (Bkrtcy.D.Md.1986), these powers remain subject to state substantive law. *Crestar Bank v. Neal (In re Kitchen Equipment Co. of Virginia, Inc.),* 960 F.2d 1242, 1245 (4th Cir.1992). This means that the trustee's powers are subject to any equitable claim recognized by the applicable state laws, including subrogation. Section 544 does not transform the trustee into a "super-priority creditor" who may defeat a prior perfected security interest or the claim of one equitably subrogated to the position of a perfected lienholder. In short, the strong arm power of section 544 does not preclude subrogating First Union to the position of Maryland National and does not allow the

---

**15.** Pursuant to section 9–201 of the U.C.C.:

Except as otherwise provided by this Act a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors.

According to the Official Code Comments for section 9–301,

The term "perfected" is used to describe a security interest in personal property which cannot be defeated in insolvency proceedings or in general by creditors. A security interest is "perfected" when the secured party has taken whatever steps are necessary to give him such an interest.

U.C.C. § 9–301 Official Code Comment 1 (1994).

In this case, Maryland National took the necessary steps to perfect its first priority security interest in the debtors' inventory and receivables. As discussed previously, equitable subrogation places First Union in the shoes of Maryland National and no additional filings are necessary to continue perfection of an assigned security interest. Therefore, First Union possesses a perfected security interest in personal property "which cannot be defeated in insolvency proceedings or in general by creditors."

Trustee to avoid a perfected security interest.

### 4. Prejudice and Intervening Equities

Trustee argues that subrogation of First Union into the shoes of Maryland National, a creditor whose debt was extinguished by the January 1989 refinance, would greatly prejudice its interest in representing the debtors' subsisting creditors. Because of these intervening equities, subrogation should be denied.

 Subrogation is not an absolute right, but instead one which depends on the equities and attending circumstances of each case. *Compania Anonima Venezolana de Navegacion v. A.J. Perez Export Co.*, 303 F.2d 692 (5th Cir.), *cert. denied*, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962). The right of subrogation does not exist where it appears contrary to the parties' intent—for instance, where the intent was not to keep the debt alive, but to extinguish it, or where the lender intended to rely on other security—although the fact that the lender took additional security will not rule out subrogation. 73 Am.Jur.2d *Subrogation* § 11 at 606 (1974). Nor will subrogation be enforced to prejudice rights of equal or higher ranks or to displace the equity of another person.

*Milholland v. Tiffany*, 64 Md. 455, 2 A. 831, 835 (1886).

 In this case, there is a real question as to whether any intervening creditors in fact would be prejudiced by subrogation. Before First Union refinanced the Maryland National debt, all creditors had been put on notice of a first priority perfected security interest in the subsidiaries' assets by reason of Maryland National's properly filed financial statements. As a condition of First Union's refinancing of the Maryland National debt, the parties agreed that First Union was to assume the same first priority security interest in the same personal property. Had the parties formally documented this assignment, First Union would have automatically assumed the position of security holder and all other creditors would have remained in the same position. In other words, junior lienholders would not have been prejudiced by the change in identity of the senior lienholder. *See Federal Land Bank of Springfield v. Smith*, 129 Me. 233, 151 A. 420, 422 (1930).

 Trustee contends, however, that when First Union refinanced the Maryland National debt both the debt and the accompanying security interest were extinguished.[16] Trustee argues further that because First Union did not file any financial

---

16. The Trustee has cited cases identifying circumstances in which subrogation would not apply because the original debt had been discharged rather than renewed. *See, e.g., Harder v. United States*, 22 U.C.C.Rep.Serv.2d 1165, 1993 WL 667770 (D.Mass.1993); *Bennett v. Westfall*, 186 Md. 148, 46 A.2d 358, 360 (1946). These cases can be distinguished from the case at bar.

In *Harder*, for example, the court found no evidence that in extending funds for a new loan, the parties intended to renew the prior security: "paying off a first loan with the proceeds of a second, *without any manifestation that the parties intended simply to renew the first*, is decisive evidence that the parties have extinguished the first obligation." *Harder*, 1993 WL 667770 at *8. The court proceeded to state, however, that "[t]he critical issue turns on the manifest intent of the parties.... Whether the parties have created a new obligation, or renewed an old one, is unquestionably a matter of intent." *Id.* 1993 WL 667770 at *9. In this case, it is manifest from commitment letter executed before the refinance closing and undisputed by the Trustee that both the debtors and First Union intended for First Union to assume the first-priority perfected security interest in the inventory and receivables held by Maryland National.

In *Bennett*, the court held that subrogation does not apply:

where the new mortgage is given to a different person from whom the debtor borrowed to money to pay off the old mortgage nor where the new mortgage secures a distinct debt from the old, or an additional debt, the satisfaction in such cases operating as a complete discharge of the first mortgage.

*Id.* 46 A.2d at 360. As with *Harder*, this language is simply inapposite to the case at bar. When the parties negotiated the 1989 refinance, the first-priority perfected security interest was not to be given to "a different person from whom the debtor borrowed the money to pay off the old mortgage." The security interest was to be given to First Union, the very "person" from whom the debtors borrowed the funds to pay off the Maryland National indebtedness. Moreover, the new security interest was to secure the same property, i.e., the subsidiaries' inventory and accounts receivables, as the old security interest. Finally, First Union does not claim to be subrogated to any interest in additional debt.

statements until February 12, 1992, any lender who extended credit between the 1989 retirement date and the February 12, 1992, filing date, including Trustee as the hypothetical judgment creditor, would be prejudiced by the granting of a first-priority lien to First Union. Trustee's argument fails for several reasons. First, whether a debt or security will be treated as "extinguished" is a question of intent. *See Harder v. United States*, 22 U.C.C.Rep.Serv.2d 1165, 1177, 1179, 1993 WL 667770 (D.Mass.1993). Here, although the parties intended to pay off the Maryland National indebtedness, neither the debt to First Union nor the first priority security interest backing that debt was intended to be extinguished. Instead, the parties intended that First Union be substituted to both the debt and security of Maryland National. As the court stated in *Martin v. Hickenlooper*, 90 Utah 150, 59 P.2d 1139 (1936):

> [W]hen one pays under such circumstances as to raise the presumption that the lender did not intend to extinguish the debt or release the security which was paid or released by the lender's advancements, it will be looked on in equity as if he had purchased the credit together with the security. An equitable assignment would be raised and the release canceled and the lender subrogated.

*Id.* 59 P.2d at 1150, *citing Heisler v. C. Aultman & Co.*, 56 Minn. 454, 57 N.W. 1053 (1894).

Second, as mentioned previously, even if Maryland National had formally released its recorded security interests, courts have held that the doctrine of equitable subrogation operates to keep a lien alive in favor of one who has paid the lienholder, even though the latter has satisfied and discharged the lien of record, as long as the loan was made for the purpose of discharging the prior encumbrance. *Levenson v. Capital Mortgage*, 101 Md.App. 122, 643 A.2d 505, 510 (1994); *Kaplan v. Walker*, 164 N.J.Super. 130, 395 A.2d 897, 900 (1978); *French Lumber Co. v. Commercial Realty & Finance Co.*, 346 Mass. 716, 195 N.E.2d 507 (1964).

Third, Maryland National in fact never did formally release or terminate its recorded security interest. Therefore, any intervening creditor would have been put on notice of an outstanding priority lien in the debtors' inventory and accounts receivables, and would not be prejudiced by First Union's assumption of this interest.[17] In other words, no creditor would be prejudiced by the equitable subrogation of First Union to the position of Maryland National, a position expressly intended by both parties at the time of the refinancing. Rather, by refusing to recognize the first-priority security interest assignment that the parties' agreed to, but negligently failed to formalize, Trustee, and the creditors he represents, would in effect receive a windfall relief from that debt. Alternatively, by recognizing the equities of the situation and applying subrogation, Trustee, and the creditors he represents, would merely be deprived of this windfall.[18] Thus, for

17. Likewise, because Maryland National's financial statements remained on record providing notice to all subsequent creditors of a first-priority lien in debtors' inventory and receivables, no creditors could claim that they reasonably relied on First Union's failure to file to their detriment.

18. By comparison, in *Milholland v. Tiffany*, 64 Md. 455, 2 A. 831 (1886), where a lender paid off an incumbrance at the request of the debtor and took security on the property that turned out to be defective, the court held that the lender ought to be substituted to the rights of the incumbrancer unless such substitution would operate to the prejudice of superior or equal equities. *Id.* 2 A. at 835. The court reasoned:

> The property still remains subject to the payment of these debts in the same manner and to the same extent as if the voluntary conveyance had not been made, and the purchase mortgage had not been paid. One the other hand, unless he is so substituted, the appellee must necessarily lose the money advanced and paid by him on account of the mortgage, and the payment thus made would inure to the benefit of [the debtor's] subsisting creditors. It does seem to us, therefore, that he is, upon the plainest principles of justice, entitled to the right of substitution.

> *Id.*

In this case, First Union did not receive a defective security agreement or financial statement; the parties simply failed to execute the necessary documents. However, the logic of *Milholland* still applies. If First Union was to be subrogated to the position of the prior incumbrancer, Maryland National, the inventory and accounts receivables would remain subject to the payment of the subsidiaries' debts in the same manner and to the same extent as if First Union

the above stated reasons, the Court concludes that no intervening equities preclude the application of conventional subrogation in this case.

## IV. CONCLUSION

For the foregoing reasons, First Union is entitled to conventional subrogation based on the parties' express or implied agreement that First Union would receive the same first-priority perfected security interest in the subsidiaries' inventory and accounts receivable held by the previous creditor, Maryland National, in exchange for First Union's refinance of the Maryland National debt. Moreover, Trustee has failed to establish either gross negligence or intervening equities which would preclude equitable subrogation. Because First Union was equitably subrogated to the position of Maryland National at the time it paid the Maryland National debt, it received its perfected security interest in January, 1989, well outside the 1992 preference period. Thus, since the strong arm clause of the federal bankruptcy code remains subject to the equitable doctrines of governing state law, including subrogation, First Union possesses a perfected security interest that is both superior to, and non-avoidable by, the Trustee.

Accordingly, by separate Order the Court shall affirm the actions of the Bankruptcy Court.

had not paid off this prior debt. On the other hand, unless First Union is so substituted, it will lose the money advanced and paid by it on account of the loan, and the payment thus made would inure to the benefit of the debtors' subsisting creditors. Thus, "upon the plainest principles of justice," First Union is entitled to the right of substitution.