**In re REBEL RENTS, INC., a California corporation,**

**Perris Valley Rentals, Inc., a California corporation, Debtors.**

**Textron Financial Corporation, Movant,**

**v.**

**Rebel Rents, Inc., and Perris Valley Rentals, Inc., Respondents.**

**No. RS02–25442 PC.**

United States Bankruptcy Court, C.D. California, Riverside Division.

Feb. 20, 2004.

---

David K. Eldan, Ivanjack & Lambirth, LLP, Los Angeles, CA, for Textron Financial Corporation.

Fidel J. Orantes, Winthrop Couchot Professional Corporation, Newport Beach, CA, for Rebel Rents, Inc.

Gregory A. Bray, Haig M. Maghakian, Milbank, Tweed, Hadley & McCloy, LLP, Los Angeles, CA, for General Electric Credit Corporation.

## MEMORANDUM DECISION

PETER H. CARROLL, Bankruptcy Judge.

Textron Financial Corporation ("Textron") filed a motion alleging unauthorized use of its cash collateral by Rebel Rents, Inc. and Perris Valley Rentals, Inc. (collectively, "Rebel"). Textron seeks either a turnover of the cash collateral or alternatively, allowance and payment of a super-priority administrative expense claim in the amount of $430,661 pursuant to 11 U.S.C. §§ 507(a)(1) and 507(b). Rebel and General Electric Capital Corporation ("GECC") oppose the motion. At the hearing, David K. Eldan appeared on behalf of Textron; Gregory A. Bray and Haig M. Maghakian appeared for GECC, and Fidel J. Orantes appeared for Rebel. The court, having considered the pleadings, evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law[1] pursuant to Fed.R.Civ.P. 52, as incorporated into Fed.R. Bankr.P. 7052 which is applicable to contested matters. Fed.R.Bankr.P. 9014.

## I. STATEMENT OF FACTS

Rebel is the largest independent equipment rental company in Southern Califor-

nia. Rebel conducts business at eleven locations in San Bernardino, Riverside, and San Diego Counties, offering a wide inventory of equipment for sale or lease to construction companies, industrial concerns, commercial businesses, and residential homeowners.

### A. Textron's Lien.

Sometime prior to September 14, 2000, Rebel executed a Distributor Security Agreement with Snorkel International, Inc. ("Snorkel") in conjunction with the purchase of certain inventory for use in its equipment rental business.[2] On September 27, 2000, Snorkel filed a financing statement with the California Secretary of State which described the collateral in an attached Exhibit A, as follows:

> Snorkel Telescoping Booms, Articulating Booms, Scissor Lifts, Aerial Work Platforms, and other new and used inventory, machinery, equipment, attachments, accessories and replacement parts therefor manufactured or sold by Snorkel International, Inc. to Debtor, now owned or hereafter acquired, wherever located, upon which any sum of money whether principal or interest remains unpaid, *plus all proceeds derived therefrom.*

> It is understood that the "Collateral" described above excludes inventory for which the invoices have been paid.[3]

On September 14, 2000, Rebel executed a "Finance Plan" and "Wholesale Security

---

1. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

2. *Creditor Textron Financial Corporation's Reply in Support of Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim,* Exhibit 1, p. 28. Snorkel's security agreement does not bear a date of execution.

3. *Creditor Textron Financial Corporation's Reply in Support of Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim,* Exhibit 2, p. 34 (emphasis added)

Agreement" with Textron to finance its purchase of the inventory from Snorkel,[4] and granted Textron a security interest in the following collateral described in Exhibit A to the Rental Inventory Addendum to Wholesale Security Agreement:

> All equipment and inventory, wherever located, in which Debtor now or hereafter has rights, financed or refinanced by Secured Party for Debtor, including, but not limited to, telescopic material handlers, aerial work platforms, skid steers, wheel loaders, mini excavators, power haulers and related products; all present and future attachments, accessories and accessions thereto; all spare parts, replacements, substitutions and exchanges therefor; all trade-ins relating thereto; *all instruments, accounts and chattel paper arising therefrom (including leases and conditional sales contracts); and the proceeds of all of the foregoing, including proceeds in the form of goods, accounts, chattel paper, documents, instruments and/or general intangibles.*[5]

Textron, however, did not file a financing statement with the California Secretary of State to perfect its security interest in the collateral until January 16, 2001. There is no evidence that Snorkel expressly assigned its security interest and lien to Textron nor that Snorkel filed a statement of assignment with the California Secretary of State in conjunction with the financing arrangement with Rebel.

### B. GECC's Lien.

On December 29, 2000, Rebel obtained a $23,000,000 revolving line of credit ("Line of Credit") and a $2,000,000 term loan ("Term Loan") from GECC. The Line of Credit and Term Loan were evidenced by a Loan Agreement and Term Loan Note, each dated December 29, 2000. In conjunction therewith, Rebel executed a Security Agreement dated December 29, 2000, granting GECC a security interest in substantially all of Rebel's assets, including accounts receivable, chattel paper, contracts, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, investment property, deposit accounts and other accounts, money, cash and cash equivalents, together with all "[p]roceeds and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing."[6] On January 5, 2001, GECC filed a financing statement with the California Secretary of State to perfect its security interest in the collateral.[7]

In conjunction GECC's loan, Rebel implemented a cash management system controlled by GECC consistent with GECC's need to perfect its security interest in Rebel's depository accounts. Credit card payments processed and wired to Rebel's depository accounts, together with customer payments and other revenues deposited daily into the accounts, were swept each day by GECC. On the date of bankruptcy, the balance in Rebel's deposit accounts was ($363,434).

---

**4.** At the time, Snorkel and Textron were wholly-owned subsidiaries of Textron, Inc.

**5.** *Creditor Textron Financial Corporation's Reply in Support of Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim,* Exhibit 4, p. 41 (emphasis added).

**6.** GECC's *Objection to Textron Financial Corporation's Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim and Joinder to Opposition Thereto filed by the Reorganized Debtors,* Exhibit A.

**7.** GECC's *Objection to Textron Financial Corporation's Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim and Joinder to Opposition Thereto filed by the Reorganized Debtors,* Exhibit B.

### C. *Rebel's First Cash Collateral Motion.*

On September 23, 2002, Rebel filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code [8]. In Schedule D, Rebel listed Textron as the holder of a claim in the amount of $1,987,117 incurred on September 14, 2000, secured by collateral having a value of $1,987,117.

On September 23, 2002, Rebel filed an emergency motion seeking, among other things, an interim order authorizing the use of cash collateral pursuant to 11 U.S.C. § 363 and identifying GECC as the *only entity* holding an interest in its cash collateral.[9] In Paragraph C of the motion entitled "Rebel's Debt Structure," Rebel stated:

> "The only debts which are secured by a lien on the Debtors' cash and cash equivalents are the loans held by General Electric Capital Corporation ('GECC'), which had an outstanding balance as of the filing of the Debtors' bankruptcy petitions of approximately $22.1 million." [10]

In Paragraph E entitled *"Other Secured Indebtedness,"* Rebel further stated:

> "The Debtors are also indebted to other creditors, which, by virtue of documents denominated as leases or credit agreements, hold security interests in one, or more particular pieces of equipment or vehicles owned by the Debtors." [11]

Textron was served with notice of Rebel's emergency motion on September 25, 2002, but did not file an objection to Rebel's proposed use of cash collateral. On September 27, 2002, the court entered an emergency interim order authorizing Rebel's use of cash collateral pending a final hearing which was set for October 18, 2002.[12]

On October 3, 2002, Rebel served creditors and parties in interest, including Textron and Snorkel, with notice of the date and time of the final hearing on its cash collateral motion. Neither Snorkel nor Textron objected to the use of cash collateral nor the granting of replacement liens to GECC as proposed in Rebel's motion.

On October 29, 2002, the court entered a final order authorizing Rebel's use of cash collateral pursuant to 11 U.S.C. § 363 and Fed.R.Bankr.P. 4001(b). Both Textron and Snorkel were served with a copy of the final order, according to the proof of service filed with the court. Neither Snorkel nor Textron appealed the final order.

### D. *Textron's Adequate Protection and Proof of Claim.*

By letter dated December 18, 2002, Textron advised Rebel that "the principal bal-

---

8. Unless otherwise indicated, chapter, section and code references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

9. *Debtor's Emergency Motion for Interim Order Approving (1) Approving Financing Pursuant to 11 U.S.C. §§ 364(c) & (d); (2) Approving Use of Cash Collateral Pursuant to 11 U.S.C. § 363; (3) Approving Lien Against Estate Property; (4) Approving Superpriority Administrative Claim Against Estate; (5) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)* filed on September 23, 2002.

10. *Id.* at p. 3, l.25–28.

11. *Id.,* at p. 4, l.20–23.

12. *Interim Order (I) Authorizing Secured Post-petition Financing on a Superpriority Basis Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)* entered on September 27, 2002.

ance outstanding on the debtor's obligation under the Rental Inventory Security Agreement and Finance Plan with Textron is $1,987,116.63, with interest accrued through November 30, 2002 in the sum of $254,818.73, for a total of $2,241,935.36." [13] In the letter, Textron demanded adequate protection payments from Rebel of $38,393.66 per month. On December 24, 2002, Rebel offered Textron monthly adequate protection payments of $12,200 "calculated based on the value of TFC's collateral as of the Petition Date, September 23, 2002, and an annual depreciation of 15% as estimated by our appraisers." [14] By letter dated January 6, 2003, Textron advised Rebel that it would accept "adequate protection payments, in the amount of $12,200.00 with full reservation of all rights...." [15] After December 24, 2002, Rebel made, and Textron accepted, monthly adequate protection payments of $12,200 per month, which continued through plan confirmation.

On January 13, 2003, Textron filed a Proof of Claim asserting a secured claim for principal and accrued interest totaling $2,241,935.36. As evidence that its security interest had been perfected,[16] Textron attached to its proof of claim copies of its Finance Plan, Wholesale Security Agreement, Rental Inventory Addendum, and financing statement filed on January 16, 2001.

### E. Rebel's Second Cash Collateral Motion.

On February 28, 2003, Rebel filed a second emergency motion for authorization to use cash collateral.[17] In its motion, Rebel again stated:

"The only debts which are secured by a lien on the Debtors' cash and cash equivalents are the loans held by GE Capital, which had an outstanding balance as of the filing of the Debtors' bankruptcy petitions of approximately $22.1 million."

Snorkel, Textron and Textron's counsel were served with the motion and notice of hearing, but did not appear at the emergency hearing on March 3, 2003, nor other-

13. Letter from Thomas E. Shuck, Esq. to Paul J. Couchot, Esq. dated December 18, 2002. *Creditor Textron Financial Corporation's Reply in Support of Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim*, Exhibit 14, p. 59.

14. Letter from Fidel J. Orantes, Esq. to Thomas E. Shuck, Esq. dated December 24, 2002. *Creditor Textron Financial Corporation's Reply in Support of Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim*, Exhibit 14, p. 61. The relevant portion of an appraisal obtained by Rebel was enclosed in the letter showing a forced liquidation value of $813,000 and orderly liquidation value of $975,600 for 29 items of equipment which comprised Textron's collateral.

The nature of the Textron Collateral on the Petition Date may be summarized as follows: it consisted of 29 boom lifts of five (5) different types: three (3) 50' Knuckle Die lifts; two (2) 66' JIB/Telescoping lifts; six

(6) 60' Telescoping 2x4 lifts; fourteen (14) 60' Telescoping 4x4 lifts; and four (4) 60' Knuckle lifts.
*Declaration of Felix Fidelibus in support of Creditor Textron Financial Corporation's Notice of Motion and Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim*, p. 9, l.7–10.

15. Letter from Thomas E. Shuck, Esq. to Fidel J. Orantes, Esq. dated January 6, 2003. *Creditor Textron Financial Corporation's Reply in Support of Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim*, Exhibit 14, p. 63.

16. "If a security interest in property of the debtor is claimed, the proof of claim shall be accompanied by evidence that the security interest has been perfected." Fed.R.Bankr.P. 3001(d).

17. *Debtor's Emergency Motion for Order Approving Use of Cash Collateral Pursuant to 11 U.S.C. § 363* filed on February 28, 2003.

wise object to Rebel's proposed use of cash collateral. On March 27, 2003, the court approved a stipulation between Rebel and GECC authorizing the continued use of cash collateral by Rebel pursuant to 11 U.S.C. § 363 and Fed.R.Bankr.P. 4001(b).[18]

### F. Disclosure Statement and Plan of Reorganization.

On May 12, 2003, GECC filed a disclosure statement and proposed plan of reorganization for Rebel. Textron filed an objection to the disclosure statement on June 16, 2003, and appeared through counsel on June 17, 2003, at the hearing on approval of the disclosure statement. At the June 17th hearing, Textron's counsel asserted *for the first time* Textron's position that Textron's lien included not only on the 29 items of equipment ("Equipment") upon which it had been receiving adequate protection payments since December 24, 2002, but also any revenue generated by Rebel's lease of the Equipment to its customers after the date of bankruptcy.

After the June 17th hearing, Textron's counsel participated actively in negotiations among GECC, Rebel, the Creditors' Committee, and other parties in interest through June 20, 2003, to resolve objections to GECC's disclosure statement. On June 25, 2003, the court entered an order approving the First Amended Disclosure Statement Describing the First Amended Joint Chapter 11 Plan Proposed by GE Capital Corporation ("Disclosure Statement"). The court also set a hearing for August 5, 2003, on confirmation of the First Amended Joint Plan of Reorganization for Rebel Rents, Inc. and Perris Valley Rentals, Inc. Submitted by General Electric Capital Corporation dated June 18, 2003 ("Plan").

### G. Textron's Motion for Relief from Stay.

On July 25, 2003, Textron filed a motion seeking relief from the automatic stay under 11 U.S.C. § 362(d)(2) alleging that Rebel had no equity in the collateral securing its claim and that its collateral was not necessary for an effective reorganization in the case. Textron attached to the motion a list itemizing the Equipment comprising its collateral, together with a copy of the Finance Plan, Wholesale Security Agreement, Rental Inventory Addendum, and financing statement filed on January 16, 2001. Textron also alleged that its security interest extended to "proceeds generated by the equipment," but was unable to identify the specific items rented nor the amount of rental income ostensibly subject to its lien.[19] Before the matter was heard, Textron withdrew its motion by notice filed with the court on August 15, 2003.

### H. Confirmation of Rebel's Plan of Reorganization.

Section 2.4.1 of the Plan described the following treatment of Textron's allowed secured claim:

**2.4.1. Class 4a: Textron Secured Claims.** Class 4a consists of the Allowed Secured Claims of Textron, its assignee or successor in interest, arising from the sale of equipment to the Debtors.

Class 4a is impaired under the Plan. Textron shall receive the collateral securing its claim and retain an Allowed

---

18. *Joint Stipulated Order Re Debtors' Emergency Motion for Order Approving Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Request for Approval Thereof; Order Thereon* entered on March 27, 2003.

19. *Declaration of Eugene R. Pittenger in Support of Motion for Relief from the Automatic Stay Under 11 U.S.C. § 362,* p. 3, 1.14 to p. 4, 1.4.

Unsecured Deficiency Claim to the extent that such holder's Allowed Secured Claim exceeds the Collateral Value attributed to such holder pursuant to Section 9.6 of the Plan.[20]

Section 9.6 of the Plan further provided, in pertinent part:

**9.6 Valuation of Other Secured Claims.** The "Collateral Value" of the collateral securing the Other Secured Claims in Classes 4a-c shall be deemed to be as follows unless, upon motion by the Secured Creditor, after notice and a hearing, the Bankruptcy Court shall order otherwise:

| Secured Creditor | Collateral Value | Collateral Useful Life |
|---|---|---|
| Textron—Class 4a | $610,000 | 5 years [21] |

On July 23, 2003, Textron filed an objection to confirmation of the Plan alleging that the $610,000 valuation of Textron's collateral was limited to the Equipment and did not include proceeds.[22] Textron acknowledged the necessity of filing a motion to value its interest in the proceeds, but complained that Section 9.6 of the Plan did not establish a date by which such a motion must be filed or resolved.[23] Finally, Textron asserted that lease income attributable to the Equipment was cash collateral and that it was entitled to allowance of an administrative expense for Rebel's unauthorized use of such cash collateral during the pendency of the case.[24]

On August 5, 2003, the court overruled Textron's objection to confirmation finding that the Plan was "fair and equitable" as to Textron because Textron was receiving the collateral securing its claim pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii) and retaining an allowed unsecured deficiency claim to the extent that its allowed claim exceeded the value of its collateral. On August 26, 2003, the court entered an order confirming the Plan.[25] Neither Textron nor any other party in interest appealed from the confirmation order. The order confirming the Plan became final on September 5, 2003. Paragraph 6 of the confirmation order stated, in pertinent part:

Holders of Class 4a—Textron Secured Claims—shall receive the collateral securing their claims on or after the Effective Date. The Reorganized Debtor shall make such collateral available to holders of Class 4a Claims during regular business hours at such location(s) as the collateral is located in the ordinary course of the Reorganized Debtor's business.[26]

On September 19, 2003, Rebel surrendered the Equipment to Textron pursuant to the Plan and confirmation order.

On September 19, 2003, Textron filed its motion alleging that Rebel received gross income of approximately $430,661 attributable to its rental of the Equipment between September 23, 2002 and September 19, 2003, and that such funds were "proceeds" subject to its lien.[27] Textron seeks

---

**20.** *Plan*, p. 12, l.25 to p. 13, l.4.

**21.** *Id.* at p. 31, l.15–20.

**22.** *Creditor Textron Financial Corporation's Objection to First Amended Plan of Reorganization for Rebel Rents, Inc. And Perris Valley Rentals, Inc. Submitted By General Electric Capital Corporation Dated June 18, 2003*, p. 2, l.11–14.

**23.** *Id.* at p. 2, l.14–17.

**24.** *Id.* at p. 2, l.18–24.

**25.** *Order Confirming the First Amended Joint Plan of Reorganization for Rebel Rents, Inc. And Perris Valley Rentals, Inc. Submitted by General Electric Capital Corporation Dated June 18, 2003* entered on August 26, 2003.

**26.** *Id.* at p. 8, l.10–15.

**27.** *Creditor Textron Financial Corporation's Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim*, p. 2, l.18 to p. 3, l.5.

a valuation of its interest in such revenues.[28] Textron further seeks an immediate turnover of the funds by Rebel or alternatively, allowance and payment of a super-priority administrative expense claim in the amount of $430,661 pursuant to 11 U.S.C. §§ 507(a)(1) and 507(b), reasoning that such funds constituted Textron's cash collateral and that Rebel's use of the funds during the pendency of the bankruptcy violated 11 U.S.C. § 363(c)(2) & (4).[29]

While conceding that Textron had a valid lien on the Equipment surrendered under the Plan, GECC and Rebel oppose the motion arguing that Textron has failed to establish a valid lien on the Equipment rental income or that its alleged lien has priority over GECC's blanket lien on substantially all of Rebel's assets, including Rebel's cash and cash equivalents. GECC and Rebel further assert that Textron is estopped from seeking a turnover of the rental income because they justifiably relied on Textron's failure to object to the use of cash collateral during the pendency of the case and Textron's acceptance of adequate protection payments from Rebel for the use of its collateral through confirmation of the plan. Rebel further opposes allowance of Textron's administrative expense request because "the revenue generated by the Textron equipment was more than completely offset by the expenses [Rebel] incurred to generate them ... result[ing] in a loss of $105,782.56." [30]

In its reply, Textron argues that its lien on rental income preceded GECC's because it was equitably subrogated to Snorkel's lien rights, including Snorkel's financing statement filed on September 27, 2000, when it refinanced Rebel's debt to Snorkel.[31] Textron denies that it "sat on

**28.** *Id.* at p. 3, l.5–8.

**29.** *Id.* at p. 4, l.18–20; p.5, l.21–21. There is no specific statutory remedy for a debtor in possession's unauthorized use of cash collateral. *In re Four Seasons Marine & Cycle, Inc.,* 263 B.R. 764, 769 (Bankr.E.D.Tex.2001). Section 507(b) states:

> If a trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection(a)(1) of this section arising from the stay of an action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

11 U.S.C. § 507(b). Section 507(b) requires that a superpriority claim be predicated upon an affirmative grant of adequate protection to a creditor. *See Vincent Prop., Inc. v. Five Star Partners, L.P. (In re Five Star Partners, L.P.),* 193 B.R. 603, 610 (Bankr.N.D.Ga.1996); *In re James B. Downing & Co.,* 94 B.R. 515, 520 (Bankr.N.D.Ill.1988). *See generally* 4 *Collier on Bankruptcy* ¶ 507.12[1][a], at 507–88 (Alan N. Resnick & Henry J. Sommers eds., 15th ed. rev.2003). However, the Ninth Circuit suggested in one case that a bankruptcy court may consider awarding a § 507(b) superpriority administrative claim as a remedy for the unauthorized use of cash collateral, notwithstanding the absence of an affirmative grant of adequate protection to a secured creditor. *See Owens–Corning Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale, Inc.),* 759 F.2d 1440, 1451 (9th Cir.1985) (observing that "although not literally within the provisions of section 507, Owens–Corning's injury is clearly within its spirit and deserves to be remedied by granting its claim a superpriority").

**30.** *Opposition to Motion filed by Textron Financial Corporation's Motion for Turnover of Cash Collateral and/or Administrative Claim and Joinder to Objection Thereto filed by General Electric Capital Corporation,* p. 13, l.21–27.

**31.** *Creditor Textron Financial Corporation's Reply in Support of Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim,* p. 5, l.13–14.

its rights" as a secured creditor, reasoning that it had no duty to object to Rebel's cash collateral motions. Textron asserts that it "had every reason to expect that its cash collateral was being segregated and preserved" throughout the pendency of the case because "Rebel never sought permission to use, nor did the Court authorize use of," Textron's cash collateral.[32]

## II. DISCUSSION

The court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b). Textron's motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), (K) and (O). Venue is appropriate in this court. 28 U.S.C. § 1409(a).

### A. Cash Collateral

■ Section 363(c)(2) prohibits a debtor in possession[33] from using cash collateral without either (1) the consent of each creditor with an interest in the collateral or (2) court authorization, granted after notice and a hearing.[34] *See Wattson Pac. Ventures v. Valley Fed. Sav. & Loan (In re Safeguard Self-Storage Trust)*, 2 F.3d 967, 969 (9th Cir.1993); *Scottsdale Med. Pavilion v. Mut. Benefit Life Ins. Co. (In re Scottsdale Med. Pavilion)*, 159 B.R. 295, 297 (9th Cir. BAP 1993), *aff'd*, 52 F.3d 244 (9th Cir.1995). Section 363(a) defines "cash collateral" as

[C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a). Absent consent or court authorization, a debtor in possession has an affirmative duty to segregate and account for any cash collateral in its possession, custody or control. 11 U.S.C § 363(c)(4). Segregation of cash collateral, including rents in which a creditor has a security interest, is mandatory under the statute. *Scottsdale Med. Pavilion*, 159 B.R. at 302. Segregation of cash collateral is important to secured creditors, particularly in view of the state law requirement that a creditor be able to identify cash proceeds to maintain an interest in such proceeds.[35] *See generally* 3 *Collier on Bankruptcy* ¶ 363.03[4][b], at 363–35 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2003). Section 363(c)(2)'s proscrip-

---

**32.** *Id.* at p. 11, l.18 to p. 12, l.20.

**33.** With few exceptions, a debtor in possession possesses the rights, powers and duties of a trustee in a chapter 11 case. *See* 11 U.S.C. § 1107(a).

**34.** Section 363(c)(2) states:

The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice or hearing, authorizes such use, sale or lease in accordance with this section.
11 U.S.C. § 363(c)(2).

**35.** *See* Cal. Comm.Code § 9306(2) (2000) (repealed July 1, 2001) ("a security interest ... continues in any identifiable proceeds including collections received by the debtor"). **Because the respective liens of Textron and GECC were established prior to July 1, 2001, the priority of any conflicting claims must be determined under former Division 9 of the California Commercial Code. Cal. Com.Code § 9709(a)(2003).**

tion recognizes the "unique nature of cash collateral, and the risk to the entity with an interest in such collateral, arising from the dissipation or consumption of the collateral in a rehabilitative effort in bankruptcy." *Id.* ¶ 363.03[4][c], at 363–36.

 In the Ninth Circuit, a debtor in possession seeking to use cash collateral is required to obtain the "affirmative *express* consent" of each entity having an interest in the cash collateral. *Freightliner Mkt. Dev. Corp. v. Silver Wheel Freightlines, Inc.,* 823 F.2d 362, 368–69 (9th Cir.1987) (finding that implied consent is insufficient to satisfy the requirements of § 363(c)(2), without deciding whether the secured creditor either impliedly consented to the use of its cash collateral or was estopped from denying that it had consented). In other words, a secured creditor's failure to object to the unauthorized use of cash collateral is not, in itself, tantamount to that creditor's consent to the use of its cash collateral. *Id.* at 368–69.[36] Before reaching the issue of whether Rebel violated § 363(c)(2) and (4), the court must first determine whether Textron had a lien on income derived by Rebel from leases of the Equipment.

*B. Textron Failed to Establish the Validity, Extent and Priority of Its Lien on Rebel's Lease Income*

 Section 363(o)(2) places the burden on the secured creditor to establish the validity, priority and extent of its interest in property. 11 U.S.C. § 363(o)(2). *See*

*Kondik v. Ebner (In re Standard Foundry Prods., Inc.),* 206 B.R. 475, 478 (Bankr. N.D.Ill.1997). The Ninth Circuit has held that a party seeking to establish the "extent" of its interest in property under § 363(o)(2) must satisfy a two-prong test:

"First, as a preliminary matter, the party must prove that it holds a perfected security interest in post-petition revenues to which its liens still rightly attach. (citations omitted). Second, a party must prove the amount of money to which its liens attach."

*In re Hotel Sierra Vista Ltd. P'ship,* 112 F.3d 429, 434 (9th Cir.1997). *Cf. In re GOCO Realty Fund I,* 151 B.R. 241, 252 (Bankr.N.D.Cal.1993) (holding that creditor did not have a perfected security interest in rental proceeds transferred to an attorney as a retainer); *In re 1726 Wash., D.C. Partners,* 120 B.R. 1, 2 (Bankr.D.D.C. 1990) (holding that post-petition rents were not cash collateral where the mortgagee's security interest in rents was unperfected).

 In this case, Textron failed to meet its burden under § 363(o)(2) to establish a valid, duly perfected lien on rental income attributable to the Equipment. Textron produced evidence that Rebel generated revenue of $430,661 from leases of the Equipment between September 22, 2002 through September 19, 2003.[37] However, Textron submitted no direct evidence in support of the motion establishing the validity, extent and priority of its lien on such revenue.[38] Through confirmation of the Plan, Textron repeatedly pointed to its

---

**36.** Secured creditors often file motions to prohibit a debtor in possession's unauthorized use of cash collateral, but "this necessarily remedial strategy does not substitute for the obligation of a debtor-in-possession to seek court authorization (or to obtain the necessary consents) to use cash collateral from the outset." *In re Three Partners, Inc.,* 199 B.R. 230, 237 n. 9 (Bankr.D.Mass.1995).

**37.** *Declaration of Felix Fidelibus in support of Creditor Textron Financial Corporation's Notice of Motion and Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim,* p. 10, l.6–8.

**38.** Indeed, the only direct evidence in support of Textron's motion is the Declaration of Felix Fidelibus, Chief Financial Officer and Controller of Rebel Rents, Inc., who testified:

Finance Plan, Wholesale Security Agreement, Rental Inventory Addendum, and financing statement filed on January 16, 2001, as evidence of its secured claim in this case.[39] None of these documents were authenticated by declaration nor submitted in support of Textron's motion.

Even if the court were to consider such documents, Textron's Finance Plan, Wholesale Security Agreement, Rental Inventory Addendum, and financing statement fail to establish that Textron's lien had priority over GECC's lien on the Equipment rental income. Under California law, conflicting security interests rank according to the priority in time of filing or perfection. *See* Cal. Com.Code § 9312(5)(a) (2000) (repealed July 1, 2001). A purchase-money lender's security interest in equipment is entitled to priority over conflicting interests in the same collateral only if the purchase-money security interest is perfected at the time the debtor receives possession of the collateral or within 20 days thereafter. *See* Cal. Com. Code § 9312(4) (2000) (repealed July 1, 2001).

> I offer the following declaration with respect to proceeds generated, since the filing of Rebel's bankruptcy petition, by the rental of certain items of Rebel's inventory that are *allegedly* encumbered by a senior lien held by Textron Financial Corporation ("Textron").
> . . . .
> As of the Petition Date, twenty-nine (29) items of Rebel's inventory were *allegedly* subject to a purchase-money lien of Textron Financial Corporation ("Textron").
>
> *Declaration of Felix Fidelibus in support of Creditor Textron Financial Corporation's Notice of Motion and Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim,* p. 8, l.26 to p. 9, l.4 (emphasis added).

**39.** *See* Textron's Proof of Claim filed on January 13, 2003 [Claim # 176], and Textron's Motion for Relief from the Automatic Stay filed on July 25, 2003 [Docket # 362].

There is no evidence that Textron perfected its security interest within 20 days after Rebel received possession of the Equipment. Indeed, the documents reveal that Textron's security interest attached on September 14, 2000, but was not perfected until January 16, 2001. Given that GECC's financing statement was filed on January 5, 2001, and preceded the filing of Textron's financing statement by eleven days, GECC's security interest was senior to Textron's and entitled to priority over Textron's security in the same collateral.[40]

### C. Textron Failed to Establish the Validity, Extent and Priority of a Lien on Rebel's Lease Income by Equitable Subrogation

In its reply, Textron abandons its own lien documents in favor of Snorkel's. Textron asserts that, having refinanced Rebel's debt to Snorkel, it was equitably subrogated to Snorkel's lien rights which extended to rental income.[41] While disputing that Snorkel ever had a valid lien on "proceeds,"[42] Debtor and

**40.** In fact, Textron's lien would not have attached to any of the lease revenue because GECC's lien was undersecured throughout the duration of the case.

**41.** *Creditor Textron Financial Corporation's Reply in Support of Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim,* p. 5, l.24–25.

**42.** Debtor and GECC argue that Snorkel's security interest did not attach to "proceeds" because "Snorkel failed to check the appropriate box on the cover page of the financing statement to indicate that its security interest covered proceeds." *Joint Sur–Reply of General Electric Capital Corporation and Debtors To Textron Financial Corporation's Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim,* p. 3, l.16–20. However, the test of the sufficiency of the description in a financing statement is whether it would indicate to an interested third party the possi-

GECC argue that the term "proceeds," as used in former Cal. Comm.Code § 9306(1), did not include income from Rebel's lease of the Equipment to its customers as a matter of law. Debtor and GECC further argue that Textron has not established that it is entitled to equitable subrogation, reasoning that application of the doctrine at this stage in the case works an injustice to the rights of the Debtor, GECC, and other creditors.

### 1. Snorkel's Lien on "Proceeds" Did Not Extend to Rebel's Lease Income

■ Prior to July 1, 2001, Cal. Comm. Code § 9306(1) defined the term "proceeds," as follows:

> "Proceeds" includes whatever is received upon the *sale, exchange, collection or other disposition* of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Any payments or distributions made with respect to investment property collateral are proceeds. Money, checks, deposit accounts, and the like are "cash proceeds." All other proceeds are "noncash proceeds."

Cal. Comm.Code § 9306(1) (2000) (repealed July 1, 2001) (emphasis added). Although the statute was silent as to rental income, Textron argues that former Cal. Comm.Code § 9306(1) should be construed broadly to include as "proceeds" lease income derived from a secured creditor's collateral.[43]

Historically, courts have interpreted former Cal. Comm.Code § 9306(1)'s definition of "proceeds" broadly to include whatever was received when collateral or proceeds were sold, exchanged, collected or otherwise disposed of. *See Pombo*, 495 F.2d at 512–13; *Producers Cotton Oil Co. v. Amstar Corp.*, 197 Cal.App.3d 638, 651, 242 Cal.Rptr. 914 (1988). However, none of the cases cited by Textron support Textron's contention that a security interest in "proceeds" under former Cal. Comm.Code § 9306(1) was extended to encompass income generated by a lease of the collateral. *See, e.g., McGonigle v. Combs*, 968 F.2d 810, 828–29 (9th Cir.1992) (holding that "proceeds" included settlement funds paid to compensate for permanent decline in value of stock pledged as collateral); *Pombo*, 495 F.2d at 512–13 (holding that crop "proceeds" included a federal subsidy payment); *Producers Cotton*, 197 Cal. App.3d at 651, 242 Cal.Rptr. 914 (holding that funds paid by Amstar to a third party constituted "proceeds" of a crop sale by the debtor to Amstar); *Johanson Transp. Serv. v. Rich Pik'd Rite, Inc.*, 164 Cal. App.3d 583, 592, 210 Cal.Rptr. 433 (1985) (holding that "proceeds" included freight charges paid by the purchaser upon the sale of strawberries). Indeed, the reported cases on point hold to the contrary.

---

ble existence of prior encumbrances on the collateral. *See Pombo v. Ulrich (In re Munger)*, 495 F.2d 511, 512 (9th Cir.1974); *Biggins v. Southwest Bank*, 490 F.2d 1304, 1307 (9th Cir.1973). While the box on the face of Snorkel's financing statement which states that "Proceeds of Collateral are also covered" is not checked, Exhibit A to the financing statement expressly states that Snorkel's security interest includes proceeds. Therefore, the court cannot find that Snorkel's financing statement is either seriously misleading or that Snorkel's security interest in "proceeds" is not perfected by reason of such defect. *See* Cal. Comm.Code § 9402(8) (2000) (repealed July 1, 2001).

**43.** *Creditor Textron Financial Corporation's Response to "Joint Sur–Reply" Filed With Respect to Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim*, p. 2, l.22 to p. 3, l.19.

In *Gen. Elec. Credit Corp. v. Cleary Bros. Constr. Co. (In re Cleary Bros. Constr. Co.)*, 9 B.R. 40 (Bankr.S.D.Fla. 1980), General Electric Credit Corporation, which had a first lien on a crane sold to the debtor in 1978, sought a judgment in the amount of $10,688 for rent paid by a third party to the debtor for use of the crane for 10 days during February 1980. The bankruptcy court dismissed the complaint, holding that the rental receipts were not "proceeds" subject to General Electric Credit Corporation's perfected security interest and lien on the crane. In so holding, the court stated:

> The money sought by plaintiff was not received when the collateral was sold, exchanged or collected. The words "otherwise disposed of" related to a *permanent or final conversion, not a temporary use.* Had the Sponsors intended to extend the lenders lien to include rent from the temporary use of collateral which has been given as security, they would have included the term "leased."
>
> This failure to do so could not have been inadvertent. The way to create a security interest in rent under the U.C.C. is to assign the lease or to give a security interest in the lease. The rent would then be the proceeds of the collateral as: "the account arising when a right to payment is earned under a contract right." This was the holding in *Feldman v. Philadelphia National Bank,* 408 F.Supp. 24 (E.D.Pa.1976), where the rent for an airplane was held to be the proceeds of the collateral, which in that instance was the lease which had been assigned to the lender. No such assignment or security interest in the lease was given in our case.

*Id.* at 41 (emphasis added). Similarly, in *United States v. Friend (In re A.E.I. Corp.),* 11 B.R. 97 (Bankr.E.D.Pa.1981), the bankruptcy court held that the Small Business Administration's lien on the debtor's machinery and equipment did not extend to rental payments from a lease of the collateral, as proceeds thereof. *Id.* at 101. Citing *Cleary,* the court noted that the creditor's security interest extended to "only the named collateral, and not to the contract rights or chattel paper arising out of the lease of the collateral." *Id. Cf. In re Leasing Consultants, Inc.,* 351 F.Supp. 1390, 1393 (E.D.N.Y.1972) (distinguishing between rights under a lease and rights under the equipment being leased).

Finally, in *In re Keneco Fin. Group, Inc.,* 131 B.R. 90 (Bankr.N.D.Ill.1991). Keneco Financial Group, Inc. ("Keneco"), an equipment leasing company, executed a note with Suburban National Bank of Palatine ("Suburban") in the principal amount of $304,993.31, secured by a lien on all inventory, chattel paper, accounts, contract rights, equipment, and general intangibles, together with the proceeds therefrom. Keneco defaulted on the note and filed a voluntary petition under chapter 11. Six month later, Suburban filed a motion seeking to prohibit Keneco's use of cash collateral, arguing that income from Keneco's equipment leases was subject to its lien. Keneco opposed the motion, asserting that equipment lease receipts were not Suburban's cash collateral because Suburban's financing statement did not cover income generated by the leases. Following *Cleary* and *A.E.I.,* the bankruptcy court held Suburban had a lien on the lease receipts only because Suburban's lien also included Keneco's chattel paper, stating that "courts without exception ... have found that the term 'chattel paper' includes leases of personal property." *Id.* at 95.

■ Textron argues that *Cleary* and its progeny were rejected in California when PEB Commentary No. 9 was issued by the Permanent Editorial Board of the

Uniform Commercial Code on June 29, 1992.[44] PEB Commentary No. 9 states, in pertinent part:

Lease rentals would constitute proceeds of a secured party's collateral consisting of goods even where the subsequent lease of the goods is for a term which is of a short duration in relation to the useful life of the goods. Where the goods have a limited useful life, any transfer of the use and possession of the goods in return for a consideration constitutes a disposition, however small, of the debtor's interest in the goods. If that consideration consists of chattel paper, that chattel paper and the payments thereon constitute proceeds of the secured party's collateral.

*PEB Commentary on the Uniform Commercial Code,* [FINDEX–PEB Commentaries] U.C.C. Rep. Serv. (CBC) No. 9, at 4 (June 25, 1992). However, Textron is unable to cite a single case in which a court has adopted PEB Comment No. 9 to expand former Cal. Comm.Code § 9306(1)'s definition of "proceeds" to include income derived from a lease of the collateral. Official comments, while persuasive, are not binding on the court. *See Nat'l Peregrine, Inc. v. Capitol Fed. Sav. & Loan Ass'n,* 116 B.R. 194, 198 n. 3 (C.D.Cal.1990) (stating that "although legislative history generally is a poor source of guidance for statutory interpretation, official commentaries are persuasive").

 In construing the meaning of a statute, the starting point is the language of the statute itself. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Landreth Timber Co. v. Landreth,* 471 U.S.

681, 685, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). The plain language of a statute is conclusive as to its meaning when the statutory scheme is coherent and consistent. *Ron Pair,* 489 U.S. at 240–41, 109 S.Ct. 1026. Where the statute's language is plain, "the sole function of the court is to enforce it according to its terms." *Id.* at 241, 109 S.Ct. 1026; *see Rake v. Wade,* 508 U.S. 464, 471, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993). Any judicial inquiry into the purpose, background or legislative history of the statute is foreclosed unless a literal application of the statute produces "a result demonstrably at odds with the intent of its drafters." *Ron Pair,* 489 U.S at 242, 109 S.Ct. 1026. *Accord Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (stating that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there"). Furthermore, silence should be accorded meaning when the plain language of a statute fails to address a particular situation. *See, e.g., Patterson v. Shumate,* 504 U.S. 753, 758, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) (divining Congress's intent in drafting statute by what was not said); *Taylor v. Freeland & Kronz,* 503 U.S. 638, 643, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992) (using negative implication to interpret bankruptcy statute); *Johnson v. Home State Bank,* 501 U.S. 78, 87, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) (finding significance in lack of legislative specificity in a statute).

 Former Cal. Comm.Code § 9306(1)'s definition of "proceeds," while subject to a broad interpretation,[45] cannot

---

**44.** *Creditor Textron Financial Corporation's Response to "Joint Sur–Reply" Filed With Respect to Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim,* p. 3, l.21 to p. 4, l.22.

**45.** The Uniform Commercial Code "shall be liberally construed and applied to promote its underlying purposes and policies." Cal. Comm.Code § 1102(1) (2000) (repealed July 1, 2001).

be construed beyond the statutory text. In other words, broad construction does not authorize a court to read into a statute something which does not come within the meaning of the language used in the statute. When a statute does not define a term, the court must start with the assumption that the legislative purpose is expressed by the ordinary and common meaning of the words used. *Russello v. United States,* 464 U.S. 16, 21, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *Diamond v. Diehr,* 450 U.S. 175, 182, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981).

In *Fed. Deposit Ins. Co. v. Hastie (In re Hastie),* 2 F.3d 1042 (10th Cir.1993), the Tenth Circuit Court of Appeals analyzed Oklahoma's version of U.C.C. § 9–306(1),[46] which tracks the language of former Cal. Comm.Code § 9306(1), and construed the meaning of the phrase "sale, exchange, collection or other disposition," stating:

> With respect to this definition, the term "sale" may be defined generally as "[a] revenue transaction where goods or services are delivered to a customer in return for cash or a contractual obligation to pay. [The] [t]erm comprehends [a] transfer of property from one party to another for valuable recompense." Similarly, the term "exchange" may be defined as "[the] [a]ct of giving or taking one thing for another," and the term "collect" in the context of a debt or claim may be defined as "payment or liquidation of it." Lastly, the phrase "other disposition" may be defined generally as the "[a]ct of disposing; [or] transferring to the care or possession of another; [or] [t]he parting with, alienation of, or giving up [of] property." Accordingly, each of the foregoing events describes an event whereby one asset is disposed of and another is acquired as its substitute.

*Id.* at 1045 (citations omitted). "Proceeds," as used in former Cal. Com.Code § 9306(1), is commonly understood to mean whatever is received upon a permanent or final conversion of the collateral through a sale, exchange, collection, or other disposition. *See Stodd v. Reynard (In re Shooting Star Enters., Inc.),* 76 B.R. 154, 156 (9th Cir. BAP 1987), *aff'd,* 843 F.2d 1576 (9th Cir.1988) (stating that "[p]roceeds constitute whatever is *substituted* for the original collateral"); *Am. Nat'l Bank v. Cloud,* 201 Cal.App.3d 766, 775, 247 Cal.Rptr. 325 (1988) (noting that " '[p]roceeds' ... is whatever is received when the collateral is sold"); *Imperial NH3, Div. of W. Farm Serv., Inc. v. Cent. Valley Feed Yards, Inc.,* 70 Cal.App.3d 513, 520, 139 Cal.Rptr. 8 (1977) (stating "[t]here are no 'proceeds' without a sale"). *See also In re Rumker,* 184 B.R. 621, 626 (Bankr.S.D.Ga.1995) (holding that income earned by an attorney performing under an employment contract constituted an "account," not "proceeds," and stating that an employment contract generates "proceeds" only when the contract itself is sold, exchanged, or otherwise disposed of). *Cf. Lin v. Ehrle (In re Ehrle),* 189 B.R. 771, 775 (9th Cir. BAP 1995) (applying Cal. Com.Code § 9203(1) and stating that "California authorities do not equate 'rents, issues, and profits' with 'proceeds' "); *County of San Mateo v. O'Donnell (Estate of McIntyre),* 189 Cal.App.2d 498, 500, 11 Cal.Rptr. 733 (1961) (construing Cal. Civ. Code § 1265 and observing that " 'Products, rents, issues or profits' refer not to the property itself or to its proceeds on sale but to the income derived from the property ...").

■ Statutory provisions must be read to avoid conflict with each other. *See United Sav. Ass'n of Tex. v. Timbers of*

---

**46.** Okla. Stat. Ann. tit. 12A, § 9–306(1) (West Supp.1993).

*Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 370, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). Construing former Cal. Comm. Code § 9306(1)'s definition of "proceeds" to exclude rental payments from a lease of the collateral avoids potential conflicts with former Cal. Comm.Code § 9105(1), which defines "chattel paper" to include leases,[47] and former Cal. Comm.Code § 9304(1), which sets forth the requirements for perfecting a security interest in chattel paper, including leases and lease proceeds.[48]

Finally, the fact that the term "lease" was not included in former Cal. Comm. Code § 9306(1)'s definition of "proceeds" should be accorded meaning. Had the legislature intended the term "proceeds" to include rental payments derived from a lease of the collateral, it could easily have broadened the sweep of the definition by inserting a single word, "lease." *See Cleary*, 9 B.R. at 41. However, the legislature did not include "leases" in the definition of "proceeds" under Article 9 of the California Commercial Code until July 1, 2001.[49]

Based on the foregoing, the court finds that Snorkel's lien on "proceeds" did not extend to rental income attributable to Rebel's lease of the Equipment to its customers. Textron has not alleged, nor does the evidence suggest, that Textron otherwise had a perfected senior lien on Rebel's Equipment leases and the income derived therefrom.[50] Because Textron has failed

**47.** "Chattel paper" means a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods.... Cal. Comm.Code § 9105(1)(b)(2000) (repealed July 1, 2001).

**48.** A security interest in "chattel paper" may be perfected by filing. Cal. Comm.Code § 9304(1)(2000) (repealed July 1, 2001).

**49.** Effective July 1, 2001, the definition of "proceeds" was revised to include the following:
"Proceeds,"... means any of the following property:
(A) Whatever is acquired upon the sale, *lease*, license, exchange, or other disposition of collateral.
(B) Whatever is collected on, or distributed on account of, collateral.
(C) Rights arising out of collateral.
(D) To the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral.
Cal. Comm.Code § 9102(64) (2003) (emphasis added).

**50.** Snorkel's Distributor Security Agreement describes the collateral as:
Debtor's inventory of new and used machinery and construction equipment, including without limitation all such inventory that may be returned to or repossessed by the Debtor and attachment, accessories and replacement parts therefor manufactured or sold by Secured Party or any of its Divisions and/or subsidiary or affiliate companies, now owned or hereafter acquired by the Debtor and upon which any sum of money whether principal or interest remains unpaid, *plus all proceeds derived therefrom, cash or non-cash, including (without limitation) accounts receivable and chattel paper received by Debtor in payment for sales and leases of such inventory*, proceeds of insurance policies (casualty or theft) relating to such inventory and proceeds from any disposition of proceeds.
*Creditor Textron Financial Corporation's Reply in Support of Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim*, Exhibit 1, p. 28 (emphasis added). However, Snorkel's financing statement is silent as to accounts or chattel paper, and narrowly describes Snorkel's collateral in Exhibit A as:
Snorkel Telescoping Booms, Articulating Booms, Scissor Lifts, Aerial Work Platforms, and other new and used inventory, machinery, equipment, attachments, accessories and replacement parts therefor manufactured or sold by Snorkel International, Inc. to Debtor, now owned or hereafter acquired, wherever located, upon which any sum of money whether principal or

to sustain its burden under § 363(o)(2) to establish the validity, extent and priority of a senior lien on lease revenues generated by the Equipment, the court finds that the rental income of $430,661 does not constitute Textron's cash collateral.

### 2. Textron is Not Entitled to Equitable Subrogation

■■■ Even if Snorkel's perfected lien on "proceeds" reached Rebel's Equipment lease revenue, Textron would not be entitled to equitable subrogation. In the Ninth Circuit, a party seeking equitable subrogation must satisfy a five-part test:

(1) The subrogee must have made a payment to protect his own interest;

(2) The subrogee must not have acted as a volunteer;

(3) The payment must have been used to satisfy a debt for which the subrogee was not primarily liable;

(4) The entire debt must have been paid, and

(5) Subrogation must not work any injustice to the rights of others.

*Simon v. United States*, 756 F.2d 696, 699 (9th Cir.1985); *Towers v. Moore (In re*

*DiSanto & Moore Assocs., Inc.)*, 41 B.R. 935, 938 (N.D.Cal.1984); *Baxter v. Flick (In re Flick)*, 75 B.R. 204, 206 (Bankr. S.D.Cal.1987).

■■■ Subrogation is an equitable remedy, not an absolute right. *Rinn v. First Union Nat'l Bank*, 176 B.R. 401, 414 (D.Md.1995); *Flick*, 75 B.R. at 206. Relief by way of subrogation will not be granted "where it would work an injustice, or where innocent persons would suffer, or where the result would be inimical to sound public policy." *Compania Anonima Venezolana De Navegacion v. A.J. Perez Export Co.*, 303 F.2d 692, 697 (5th Cir.), *cert. denied*, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962) (stating that subrogation is not an absolute right, "but rather, a matter of grace to be granted or withheld as the equities of the case may demand"). Consequently, the issue of whether a party is entitled to equitable subrogation turns on the facts and circumstances of each case. *See, e.g., Rinn*, 176 B.R. at 414; *Flick*, 75 B.R. at 206; *In re Alloway*, 37 B.R. 420, 425 (Bankr.E.D.Pa.1984).

■■■ Like other equitable remedies, a right to subrogation may be lost by waiver, laches, or estoppel.[51] *See Jack v.*

interest remains unpaid, *plus all proceeds derived therefrom.*
Creditor Textron Financial Corporation's Reply in Support of Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim, Exhibit 2, p. 34 (emphasis added). Because Snorkel's financing statement is more limited in scope than the security agreement it perfects, Snorkel's perfected security interest is limited to the collateral described in its financing statement. *See Northwest Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 921 (9th Cir.1988); *In re Door Supply Ctr., Inc.*, 3 B.R. 103, 105 (Bankr.D.Idaho 1980); *In re Katz*, 563 F.2d 766, 768–69 (5th Cir.1977).

51. *Rinn*, on which Textron relies, is not to the contrary. In *Rinn*, the chapter 7 trustee sought to avoid the unperfected lien of First Union National Bank ("First Union") on the

debtor's inventory and accounts receivable, and First Union argued that it was entitled to equitable subrogation having refinanced the debtor's outstanding indebtedness to Maryland National Bank ("Maryland National"). The financing statements originally filed by Maryland National to perfect its earlier security interest in the debtor's assets were never terminated or released and remained on record. The bankruptcy court held that First Union was equitably subrogated to Maryland National's security interest and that Maryland National's liens were invulnerable to attack by the chapter 7 trustee under 11 U.S.C. § 547 because they were perfected outside the preference period. *Rinn*, 176 B.R. at 406. The district court affirmed, holding that the trustee failed to establish gross negligence or intervening equities which would preclude equitable subrogation. *Id.* at 416. In so

*Wong Shee,* 33 Cal.App.2d 402, 92 P.2d 449, 454 (1939) (holding that party waived right to subrogation by asserting an inconsistent legal theory, and thereby depriving other creditors of opportunity to protect their interests). *See generally,* 73 Am. Jur.2d *Subrogation* § 131–133, at 684–85 (1974). There are four basic elements to the defense of equitable estoppel: (a) the party to be estopped must know the facts; (b) the party to be estopped must either intend that its conduct will be acted upon or act in a manner that the party asserting estoppel has a right to believe it is so intended; (c) the party asserting estoppel must be ignorant of the true facts; and (d) the party asserting estoppel must rely on the conduct to its injury. *Associated Vintage Group,* 283 B.R. at 567; *Kelley v. South Bay Bank (In re Kelley),* 199 B.R. 698, 705 (9th Cir. BAP 1996); *Heritage Hotel Ltd. P'ship I v. Valley Bank of Nev. (In re Heritage Hotel P'ship I),* 160 B.R. 374, 378 (9th Cir. BAP 1993).

■ From the outset, Rebel and GECC reasonably believed that GECC was the only creditor with a lien on Rebel's cash and cash equivalents, including the Equipment rental income. This fact is abundantly clear from the text of Rebel's first cash collateral motion, which stated:

> "The only debts which are secured by a lien on the Debtors' cash and cash equivalents are the loans held by General Electric Capital Corporation ('GECC'), which had an outstanding balance as of the filing of the Debtors' bankruptcy petitions of approximately $22.1 million." [52]

holding, the district court reasoned that the trustee and creditors were not prejudiced by subrogation, but simply deprived of a windfall based on the equities of the case. *Id.* at 415.

**52.** *Debtor's Emergency Motion for Interim Order Approving (1) Approving Financing Pursuant to 11 U.S.C. §§ 364(c) & (d); (2) Approving*

Although properly notified of the hearing, Textron took no action in response to Rebel's motion to use cash collateral. Textron did not object to Rebel's use of cash collateral nor the replacement liens granted to GECC. Textron did not otherwise respond to Rebel's motion nor allege that the Equipment rental income constituted its cash collateral. Textron did not appear at either the emergency hearing nor the final hearing on the motion. Nor did Textron appeal the final order authorizing use of cash collateral or seek relief from the order pursuant to Rule 9024 of the Federal Rules of Bankruptcy Procedure.

Textron knew of its claim, but remained silent for nearly eight months. Between December 18, 2002 and January 6, 2003, Rebel and Textron negotiated extensively concerning Rebel's use of Textron's collateral and adequate protection for Textron's interest in the collateral. The evidence establishes that Textron took no action to either confirm that Rebel was segregating and preserving the Equipment rental income or to put Rebel on notice that it considered such income as its cash collateral. Less than two months later, Rebel served Textron with its second cash collateral motion. Again, Rebel identified GECC as the *only entity* holding an interest in its cash collateral. Again, Textron did not appear at the hearings, object to Rebel's use of cash collateral or the replacement liens granted to GECC, nor appeal from the final order authorizing the use of cash collateral.

Neither Textron's proof of claim nor Textron's motion for relief from stay

*Use of Cash Collateral Pursuant to 11 U.S.C. § 363; (3) Approving Lien Against Estate Property; (4) Approving Superpriority Administrative Claim Against Estate; (5) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c ),* p. 3, l.25–28.

placed Rebel on notice of a valid claim by Textron with respect to the Equipment rental income. The only documents attached to Textron's proof of claim were Textron's Finance Plan, Wholesale Security Agreement, Rental Inventory Addendum, and financing statement filed on January 16, 2001. The same documents, which were submitted in support of Textron's motion for relief from stay filed on July 25, 2003, show that Textron's lien was inferior to GECC's lien on lease revenue attributable to the Equipment.

Textron admits that it waited until the disclosure statement hearing on June 17, 2003, before claiming that the Equipment rental income was its cash collateral.[53] Even then, Textron did not thereafter amend its proof of claim to assert a secured claim based on Snorkel's Distributor Security Agreement and financing statement nor take other action prior to confirmation to establish the validity, extent and priority of its purported lien on the Equipment rental income, as Snorkel's successor in interest. Textron did not appeal the order entered August 26, 2003, confirming GECC's Plan and overruling Textron's objection to confirmation. There is no credible evidence that either Rebel or GECC even knew the true nature of Textron's claim until litigation commenced with respect to this motion. Before filing its reply, Textron had not produced Snorkel's Distributor Security Agreement and financing statement nor argued that such documents were the basis for its claim to the Equipment rental revenues.

There is no evidence that Textron's failure to act was attributable to fraud or misrepresentations by either Rebel or GECC upon which Textron may have relied to its detriment. Nor is there evidence that Textron's failure to act resulted from accident, mistake or excusable neglect.

In its reply, Textron claims that it "had every reason to expect that its cash collateral was being segregated and preserved" by Rebel during the pendency of the case.[54] However, the evidence belies Textron's contention. There are simply no facts upon which Textron could have formulated a reasonable belief that Rebel was segregating and preserving any Equipment rental income for Textron between September 23, 2002 and September 19, 2003. Not only did Rebel and GECC reasonably believe that the rental income was not subject to Textron's lien, but Rebel's interim statements show that no separate deposit account was opened and maintained for Textron's benefit after the filing of the petition. Rebel was required to disclose all deposit accounts through interim statements submitted monthly to the United States Trustee. Shortly after the petition was filed, Rebel established separate depository accounts as debtor in possession for operations and payroll at Union Bank of California. Not only were these Rebel's only deposit accounts, but they were subject to GECC's lien and swept by GECC pursuant to the cash management system implemented by Rebel prior to bankruptcy. Rebel's interim statements were available, but admittedly never reviewed by Textron.

Justifiably relying on its understanding of the secured creditors' relative priorities, GECC undertook the risk to extend postpetition financing to Rebel. GECC ob-

---

**53.** *Creditor Textron Financial Corporation's Response to "Joint Sur–Reply" Filed With Respect to Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim,* p. 5, l.22 to p. 6, l.3.

**54.** *Creditor Textron Financial Corporation's Reply in Support of Motion for Turnover of Cash Collateral and/or Allowance of Administrative Claim,* p. 11, l.26 to p. 12, l.2.

tained a blanket lien on substantially all of Rebel's assets in return for financing Rebel's operations after the commencement of the case. GECC financed Rebel's operations for nearly a year, and then funded the plan of reorganization confirmed in the case on August 26, 2003.

Allowing Textron's request for a $430,661 super-priority administrative claim would produce a windfall to Textron and a consequence not contemplated nor anticipated under Rebel's confirmed chapter 11 plan. The undisputed evidence establishes that the $430,661 gross revenue derived from the Textron Equipment was more than completely offset by expenses of $536,443.56 incurred by Rebel to generate the income, resulting in a net loss to the estate of $105,782.56.[55] Rebel borrowed funds from GECC to cover the shortfall.

■ Equity "should not intrude . . . to relieve a party from the foreseeable consequences of a conscious course of action." *In re N. Broadway Funding Corp.*, 34 B.R. 620, 623 (Bankr.E.D.N.Y.1983). Textron has failed to establish that equitable subrogation will not work any injustice to the rights of others. Indeed, the evidence supports a contrary finding. Relief by way of subrogation will not only work an injustice to Rebel and GECC, but it would be inimical to Rebel's reorganization. For the foregoing reasons, the court finds that equitable estoppel bars Textron from invoking equitable subrogation to recover the Equipment rental income of $430,661 claimed as cash collateral.

## III. CONCLUSION

■ In summary, Textron has failed under § 363(o)(2) to establish the validity, extent and priority of its lien on the $430,661 in Equipment lease revenues claimed as cash collateral. Neither Textron's security interest nor Snorkel's perfected lien on "proceeds" defeat GECC's senior lien on rental income attributable to Rebel's lease of the Equipment to its customers. Even if Snorkel's lien reached Rebel's Equipment lease revenue, equitable estoppel bars Textron from invoking equitable subrogation to obtain either a turnover of the Equipment rental income or an administrative claim against the estate. Because Rebel had no duty to segregate the Equipment lease revenue as Textron's cash collateral under § 363(c)(2) and (4), Textron's motion is denied.[56]

---

55. *See* Footnote 30, *infra*.

56. Having denied Textron's motion, it is unnecessary for the court to consider Rebel's further contention that Textron's motion should be denied under § 552(b)'s equity exception because the estate derived no benefit from the net loss generated by the Equipment leases. *Opposition to Motion filed by Textron Financial Corporation's Motion for Turnover of Cash Collateral and/or Administrative Claim and Joinder to Objection Thereto filed by General Electric Capital Corporation*, p. 12, l.20 to p. 13, l.28. Section 552(b)(1) states:

Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, or profits of such property, then such security interest extends to such proceeds, product, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, *except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.*

11 U.S.C. § 552(b)(1) (emphasis added). Section 552(b)(2) further states:

Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commence-

The court will enter a separate order consistent with this opinion.

ment of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property ..., then such security interest extends to such rents ... acquired by the estate after the commencement of the case to the extent provided in such security agreement, *except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.*
11 U.S.C. § 552(b)(2) (emphasis added). Section 552(b)'s equity exception was intended to "address those instances where expenditures of the estate enhance the value of proceeds which, if not adjusted, would lead to an unjust improvement of the secured party's position." *N.H. Bus. Dev. Corp. v. Cross Baking Co. (In re Cross Baking Co.),* 818 F.2d 1027, 1033 (1st Cir.1987). *See, e.g., J. Catton Farms v. First Nat'l Bank of Chicago,* 779 F.2d 1242, 1246 (7th Cir.1985) (stating that the equity exception applies where a debtor in possession uses other assets of the bankruptcy estate to increase the value of a secured creditor's collateral); *Wolters Vill., Ltd. v. Vill. Props., Ltd. (In re Vill. Props., Ltd.),* 723 F.2d 441, 444 (5th Cir.1984) (observing that the purpose of § 552(b)'s exception was to "cover cases where an expenditure of the estate's funds increases the value of the collateral").